THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.*
CHARLES B. BOWEN, Appellant.

1. AGRICULTURAL LAW — SALE OF MILK TO WHICH A FOREIGN SUB-
STANCE IS ALLEGED TO HAVE BEEN ADDED — EVIDENCE — WHEN
DEFENDANT MAY PROVE FACTS TENDING TO SHOW NO SUCH ADDITION
WAS MADE. The object of the Agricultural Law (L. 1893, ch. 338; L.
1900, ch. 101) is to promote the health of the public by securing pure
milk for its use and to prevent fraud through the offer of impure milk
for sale as pure. These objects are effected by three methods: 1. By
creating a standard of natural component parts which all milk must
reach before it can be sold as pure. 2. By creating a standard depending
on the condition of the cow and prohibiting the sale of milk drawn from
cows affected by parturition or by unhealthy food or when kept in a
crowded or unhealthy condition. 3. By creating a standard which
excludes foreign substances and forbidding the sale of milk from which
cream has been removed or into which any foreign substance has been
introduced. While each of the three methods forbids the sale of milk
which does not conform to the standard, there is a marked difference in
principle between proving the presence or absence of the natural elements
which must exist even if nothing has been put in or taken out, and the
presence or absence of a foreign substance which can exist only if, in
the words of the statute, it "has been added or * * * introduced."
Therefore, the mere sale of milk which does not conform to the first two
standards is conclusive evidence of a violation of the law.

Putting a foreign substance into milk, however, is a physical act and
may become an issuable fact under the statute. It is capable of proof by
either direct or circumstantial evidence, but this may be rebutted by show-
ing that the direct evidence is false or by breaking the chain of circum-

1

stances. In a case, therefore, where the complaint alleged that the milk sold "did contain a foreign substance, to wit, formaldehyde," which was denied by the answer, and testimony was given tending to support such allegation, the exclusion of evidence that neither the defendant nor any of his family, including employees, put in formaldehyde; that he had none on his premises and that the milk was delivered just as it came from the cows, constitutes reversible error; since, while the sale of milk to which a foreign substance has been added is an offense against the statute, no matter who put it in, such evidence would tend to show that no such addition had in fact been made and the defendant had the right to have it considered by the jury for what it was worth.

2. CONSTITUTIONAL LAW. The Agricultural Law so far as it prohibits the sale of milk offered as pure milk, which does not conform to the prescribed standards, is constitutional.

*People* v. *Bowen*, 97 App. Div. 642, reversed.

(Argued May 4, 1905; decided May 30, 1905.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered October 24, 1904, affirming a judgment in favor of plaintiff entered upon a verdict directed by the court and an order denying a motion for a new trial.

This action was brought to recover a penalty of $100 alleged to have been incurred by the defendant in that on the 13th of August, 1902, he "did offer and expose for sale three cans of milk" which was "adulterated and did contain a foreign substance, to wit, formaldehyde as a preservative." There was neither allegation nor proof that formaldehyde is unwholesome or that it injures milk or renders it less valuable or that any fraud was intended or committed by the defendant upon either purchaser or consumer.

The answer was a general denial. At the close of all the evidence the court directed a verdict in favor of the plaintiff for $50, although the defendant asked to go to the jury "upon the question of the fairness of the sample and the analysis, and also upon the question as to whether any foreign substance had been added to the milk at the time it was delivered to the station and offered for sale." The judgment entered accordingly was affirmed by the Appellate Division and the defendant appealed to this court.

*Clarence H. Beane* for appellant. The sections of the Agricultural Law under which this action is brought are unconstitutional. (*People* v. *Arensberg*, 105 N. Y. 123; *People* v. *West*, 106 N. Y. 293; *People* v. *Kibler*, 106 N. Y. 321; *People* v. *Girard*, 145 N. Y. 105; *People* v. *Biesecker*, 169 N. Y. 53; *People* v. *Marx*, 99 N. Y. 377; *People* v. *Jacobs*, 98 N. Y. 98; *People* v. *Jillson*, 109 N. Y. 389; *People* v. *Warden of Prison*, 157 N. Y. 116; *Dodge* v. *Cornelius*, 168 N. Y. 242; *Grossman* v. *Caminez*, 79 App. Div. 15.) The evidence offered by defendant tending to show that no formaldehyde, preservative or foreign substance had been added to the milk by himself, the members of his family or his employees, and that the milk when delivered at the station and exposed for sale was in the same physical condition as when it was drawn from the cows was competent, both for the purpose of showing that no foreign substance had been added to the milk and disputing the fairness of the sample and the correctness of the analysis. (*People* v. *Salisbury*, 2 App. Div. 39; *People* v. *Hodnett*, 68 Hun, 341; *People* v. *Laesser*, 79 App. Div. 384.)

*Julius M. Mayer, Attorney-General* (*Myron H. Peck* of counsel), for respondent. The act under which this action is brought is constitutional. (*People* v. *Cipperly*, 37 Hun, 319; *People* v. *Kibler*, 106 N. Y. 321; *People* v. *Girard*, 145 N. Y. 105; *People* v. *Biesecker*, 169 N. Y. 53; *Comm.* v. *Schaffner*, 146 Mass. 512; *State* v. *Schlenker*, 84 N. W. Rep. 659; *People ex rel.* v. *Vandecarr*, 175 N. Y. 440; *People ex rel.* v. *Tax Comrs.*, 174 N. Y. 417; *Tenement House Dept.* v. *Moeschen*, 179 N. Y. 325; *People* v. *Bootman*, 180 N. Y. 1.) Testimony that neither defendant, his employees nor members of his family adulterated the milk in question, was inadmissible. (*People* v. *Kibler*, 106 N. Y. 321: *People* v. *Laesser*, 79 App. Div. 384; *People* v. *Schaeffer*, 41 Hun, 23; *People* v. *Eddy*, 12 N. Y. Supp. 628.)

VANN, J. The Agricultural Law provides that the term "adulterated milk" means milk containing more than 88 per

centum of water or fluids, or less than 12 per centum of milk
solids, or less than three per centum of fats, or "milk which
has been diluted with water or any other fluid, or to which
has been added or into which has been introduced any foreign
substance whatever." The term also includes milk drawn
from cows within a stated period before or after parturition,
or from those fed on certain kinds of food, or kept in
unhealthy places, as well as milk from which any part of the
cream has been removed. The statute further provides that
"all adulterated milk shall be deemed unclean, unhealthy,
impure and unwholesome;" and that "no person shall sell or
exchange or offer or expose for sale or exchange any unclean,
impure, unhealthy, adulterated or unwholesome milk." (L.
1893, ch. 338, § 20; L. 1900, ch. 101, § 22.) "Every person
violating any of the provisions of the Agricultural Law shall
forfeit to the People of the State of New York the sum of
not less than fifty dollars nor more than one hundred dollars
for the first violation and not less than one hundred dollars
or more than two hundred dollars for the second and each
subsequent violation." The violation of the provisions above
quoted is also made a misdemeanor, punishable by fine or
imprisonment for the first offense and by six months' imprison-
ment for the second offense. (L. 1893, ch. 338, § 37; L. 1901,
ch. 656.)

Upon the trial evidence was given tending to show that the
milk in question, which belonged to the defendant and was
offered for sale by him, contained formaldehyde, a foreign
substance. The dipper and cup used by the agents of the
state in taking samples for analysis had been used the day
before to take samples of milk belonging to another person,
which, when analyzed, was found to contain formaldehyde.
They had also been used for the same purpose eight days
before, as well as on other occasions when samples containing
formaldehyde were taken. They were kept in a satchel when
not in use and were thoroughly cleaned every time they were
used, not immediately, but before they were used again. The
sample bottles, corks and other articles used in connection

with the dipper and cup were kept in the same satchel, which had been in use for this purpose for a long time.

Formaldehyde is not found in pure milk, but is a foreign substance. It is capable of such minute diffusion that one part in 100,000 parts of water, or one two-hundredths of a drop in an ounce of milk, can be discovered by the color and reduction tests, which were the only tests employed by the chemist who analyzed the defendant's milk. The quantity of formaldehyde contained in the samples examined was not determined and the most minute particle in a can of milk would permeate the entire mass, so that any portion would respond to the tests which were made and disclose the presence of formaldehyde to the extent found by the chemist. No complete or quantitative analysis was made and no herd sample was taken.

The foregoing facts appeared before the plaintiff rested and thereupon the defendant proved that when the samples in question were taken from his milk, his family consisted of his wife, hired girl and two hired men. By appropriate questions he tried to show that no formaldehyde, preservative or foreign substance had been added to the milk by himself, or any member of his family, including his employees, and that the milk when delivered at the station and exposed for sale was in the same physical condition as when it was drawn from the cows. The objection of the plaintiff, which specified no ground, was sustained and the defendant excepted. The following questions were asked the defendant by his counsel : "Did you use any preservative, or formaldehyde or any foreign substance in this milk? Did you at that time, or ever, have any formaldehyde, or preservative of any kind about your premises? Was the milk delivered at Griswold Station on the morning of August 13th, 1902, in the same physical condition that it was when it was drawn from the cows?"

One of the defendant's hired men was called and testified that he helped milk on the evening of August 12th and the morning of August 13th and to put the milk in the cans. In the morning he took the milk to the station. The following

questions were asked him by the defendant's counsel : " Did you put any thing into the milk, either the night's or the morning's milk at any time ?  Did Mr. Bowen or his wife or any of the members of his family, to your knowledge, put any foreign substance into this milk ?  So far as you know was the physical condition of this milk the same when it was drawn by you to the platform at Griswold Station on the morning of August 13th as it was when it was drawn from the cows ? "

All these questions were objected to upon general grounds merely, and in each instance the objection was sustained and an exception taken.

The object of the statute is to promote the health of the public by securing pure milk for its use and to prevent fraud through the offer of impure milk for sale as pure.  It seeks to effect these objects by three methods, which we will briefly consider.

1. The first method is by creating a standard of natural component parts, which all milk must reach before it can be sold as pure.  It must have certain percentages of fats and solids and must not contain more water than the percentage allowed, and in any action these are the only issuable facts, aside from the sale itself.  A penalty is imposed for selling milk that is below the standard, whether anything has been added to or taken from it or not.  Although it may be sold just as it came from the cow, if it falls below the standard fixed by law the penalty is incurred, regardless of motive, or of any act except the mere sale.  If it has more than 88 per cent of water, the owner has no right to offer it for sale as pure milk, even if no water has been added and the fault is wholly owing to the cow.  If it contains less than 12 per cent of milk solids, or less than 3 per cent of fats, it cannot be sold as pure milk, even if nothing has been taken from it and it is as rich as the cow gave it.  This penalty may be incurred without furtive intent or moral wrong.  The fault is not positive in nature, but negative, for good faith is no protection, provided the milk is not up to standard.  As some cows do not at all

times give milk with enough solids and fats in it for whole-
some food, especially in the case of young children or persons
who are ill, the legislature fixed the quality which, in its judg-
ment, was required by the interests of the public, and com-
pelled all producers as well as sellers to comply therewith at
their peril.   They must conform to the standard, or incur the
penalty.   An illustration of this method, which was attended
with some hardship, is seen in the case of *People* v. *Cipperly*,
where the dissenting opinion in the General Term was adopted
as the opinion of this court.   (37 Hun, 324; 101 N. Y. 634.)
Although it appeared in that case that nothing had been put
in the milk and nothing taken from it, the conviction of the
defendant was sustained because the legislature had fixed the
standard and he had failed to comply with it.   The fact that
he was careful and honest in the transaction was held to be
immaterial, as the controlling fact was that he sold milk which
was below the positive standard fixed by law.   This case was
followed in *People* v. *West* (106 N. Y. 293) and *People* v.
*Kibler* (106 N. Y. 321).

2. The second method is by creating a standard depending
on the condition of the cow and prohibiting the sale of milk
drawn from cows affected by parturition, or by unhealthy
food, or when kept in a crowded or unhealthy condition.   All
these are issuable facts, with no direct relation to the com-
ponent parts of the milk, but to the history of the cows which
gave it.   Even if the milk conforms to the statutory standard
as to water, fats and solids, it may not be sold as pure, pro-
vided the cows have been fed or kept in the manner specified.

3. The third is by creating a standard which excludes for-
eign substances and forbidding the sale of milk from which
cream has been removed, or into which any foreign substance
has been introduced.   This involves taking something out or
putting something in.   It is not aimed at the fault of the
cows, but at a misdeed of some one, by which a positive change
in the physical condition of the milk is effected.   The removal
of cream is a fraud which we pass by, as it is not involved in
this case.   Putting a foreign substance into milk is a physical

act and may become an issuable fact under the statute. It is
capable of proof by either direct or circumstantial evidence,
and this proof may be met by showing that the direct evidence
is false, or by breaking the chain of circumstances. Water
is a substance not foreign to milk, for it is the chief ingredi-
ent of the purest milk and hence the statute deals with it *eo
nomine*, while all foreign substances are dealt with generally
by prohibiting the sale of milk into which they have " been
introduced." Cows do not give formaldehyde, which, there-
fore, is a foreign substance, and if any was found in the
defendant's milk it was either put in by design or got in
by accident. There was evidence tending to show that a
minute portion might have accidentally got in from the
means used to take the samples, and it appeared that a micro-
scopic particle would be enough to account for all the signs
said to have been found by the chemist. The defendant had
a right to show that the samples were not fair, that the chem-
ist was mistaken in his analysis and that there was no formal-
dehyde in the samples taken from his milk. The evidence
excluded bore directly upon the issue as joined by the plead-
ings, for the plaintiff alleged that the milk " did contain a
foreign substance, to wit, formaldehyde," and the defendant
denied it. There was an offer to show that neither the defend-
ant nor any one employed by him put in formaldehyde; that
he had none on his premises and that the milk was delivered
at the railroad station just as it came from the cows. This
was competent evidence to meet the issue tendered by the
complaint and accepted by the answer, that the milk sold by
the defendant contained formaldehyde which was put in after
it left the cows. It tended to show that the statute had not
been violated by the sale of milk " to which has been added
or into which has been introduced any foreign substance what-
ever." While the sale of milk to which a foreign substance
has been added is an offense against the statute, no matter
who put it in, this evidence would have shown that no such
addition had in fact been made. The jury might not have
believed the defendant and his witnesses in view of the

chemical tests made by the state and the failure, after due notice and a fair opportunity, to have similar tests made in his own behalf, but he had an absolute right to introduce the evidence and have it considered by the jury for what it was worth. The object of the statute in providing that the milk inspector shall take duplicate samples, seal them and deliver or tender one to the owner of the milk, with a written statement " of the cause of the taking of the sample," obviously was to guard against mistake or fraud by enabling the owner to have an analysis made for himself. (L. 1898, ch. 557, amending section twelve of the Agricultural Law.) Other provisions are equally significant in this connection, to wit, if the producer refuses to allow the examination of the milk produced by his dairy, or to stir it when the sample is taken, he is precluded from offering any evidence tending to show that the sample was not fair or that the milk delivered by him was just as it came from the cow. (Id.) These provisions necessarily imply that the analysis by the state chemist may be attacked as incorrect, but if it can be attacked by showing that the milk, when tested by another chemist, showed no evidence of formaldehyde, it can be attacked by showing that no formaldehyde was put in by any one. (*People* v. *Salisbury*, 2 App. Div. 39; 151 N. Y. 663.)

This is not like the *Cipperly* and kindred cases where we dealt with the portion of the statute which required that two natural elements of milk shall exist in certain quantities and that there shall be no excess of a third natural element. That part of the statute, as we have held, can be violated by selling milk in the same condition as when it left the cow. In those cases the issue was whether the milk contained the requisite component parts, while in this it was whether a foreign substance had been added. They rested upon what was or might have been a negative wrong, but this case rests upon a positive wrong, an act of commission, not of omission. It is founded on the alleged addition by physical action of a substance foreign to milk and which is never found therein

unless it is put in by accident or design. The evidence excluded tended to show that no such substance had been put in the milk in question and it should have been received for that purpose. While each of the three methods creates a standard and forbids the sale of milk that does not conform thereto, there is a marked difference in principle between proving the presence or absence of the natural elements which must exist even if nothing has been put in or taken out, and the presence or absence of a foreign substance which can exist only if, in the words of the statute, it "has been added or * * * introduced."

The defendant claims that the judgment against him should not only be reversed but that the complaint should be dismissed, because the provisions of the statute upon which it is founded are unconstitutional. We overrule that contention. The courts have not yet held that the legislature has power to prohibit the sale of milk that is wholesome, even if not up to standard, provided it is sold for what it actually is and not as pure milk. If offered for sale as milk simply, the presumption is that it is offered as pure milk, and when so offered, without making it known in any way that it is not pure, the legislature may inflict a penalty and make the sale a crime, unless the milk has such positive and negative qualities as in its judgment pure milk should have. The principles upon which such legislation is held to be constitutional have been so thoroughly discussed that we do not deem it necessary to do anything more at this time than to cite the authorities which uphold it as a proper exercise of the police power in order to prevent fraud and preserve health. (*People* v. *Cipperly*, 37 Hun, 324; 101 N. Y. 634; *People* v. *Arensberg*, 105 N. Y. 123; *People* v. *West*, 106 N. Y. 293; *People* v. *Kibler*, 106 N. Y. 321; *People* v. *Girard*, 145 N. Y. 105; *People* v. *Biesecker*, 169 N. Y. 53, 57; *People ex rel. Lieberman* v. *Vandecarr*, 175 N. Y. 440.)

The judgment appealed from should be reversed and a new trial granted, with costs to abide event.

WERNER, J. (dissenting). In that part of the prevailing opinion which upholds the constitutionality of the statute under consideration I concur; from all the rest I respectfully dissent.

Among all the enumerated powers of government none is more important and far reaching than that branch of the police power through the exercise of which the state seeks to restrain and punish the adulteration of foods and foodstuffs. Of superlative importance is the vigilant and fearless exercise of that power in regulating the purveying of milk, which is at once the most natural, the most commonly used and the most easily adulterated of all the foods and beverages of civilized humanity. The crimes of murder and theft in their usual significance might almost be counted as virtues when compared with the poisonous adulteration of foods, for the latter combines the felonious villainy of both the former, not against selected individuals it is true, but against society at large. It is a mean and insidious crime, stealthily committed in the marts of trade by men who masquerade in the garb of good repute, but in whose breasts the qualities of honesty and morality have been stifled by the most despicable form of cupidity. It is the kind of crime upon which the pharisees of commerce wax fat at the expense of their innocent competitors, and of the poor and helpless consumers. No form of food adulteration within the field of criminal chemistry can be more deadly and far reaching in its effects than the adulteration of milk. Other adulterated foods and beverages, which are used by persons whose powers of resistance have been developed by maturity, vary so greatly in the kind and quantity of adulteration that the ill-effects from their use may be considerably minimized or altogether neutralized by regular or frequent change of diet. Not so, however, with the myriads of helpless babes for whom nature's greatest food is transformed into an artificially colored, flavored and preserved fluid, which mocks at the pangs of hunger or defies the powers of digestion; that either cheats them with the appearance of nourishment, and thus deprives them of the nutritious food

which they need, or fills their systems with drugs that may entail upon them lifelong weakness and misery. In the presence of such a crime humanity may well assert itself through the voice of its legislatures in the enactment of statutes designed to protect society, and as against such statutes the so-called common-law rights of the individual criminal should not be so zealously hedged about by technical safeguards as to render the state helpless to effectuate a great, just and humanitarian policy.                                            •

In 1884 the state of New York entered the list of American commonwealths having laws designed to exterminate the adulteration of foods. Its legislature enacted what is now known as the Agricultural Law (L. 1893, ch. 338) which, among other things, regulates the traffic in dairy products. This law was promptly attacked on the ground that it was an unconstitutional exercise of the legislative power, but its constitutionality was upheld by this court (*People* v. *Cipperly*, 101 N. Y. 634; *People* v. *West*, 106 N. Y. 293; *People* v. *Kibler*, Id. 321), and it is quite within the bounds of judicial restraint to say that no statute in force in this state to-day is exerting a more widespread and beneficent influence. Superficially the questions at bar relate merely to judicial rulings excluding evidence, but the fundamental question before this court upon this appeal is whether this law, in one of its most vital features, shall now be judicially repealed. That is the broad and important question presented, for the reversal of this judgment means nothing less than the repeal of an important part of the statute. In subdivision 8 of section 20 of the Agricultural Law one form of adulteration is defined as follows: "Milk which has been diluted with water or any other fluid, or to which has been added or into which has been introduced any foreign substance whatever." The charge in the case at bar is that the defendant offered for sale certain milk containing formaldehyde, and it is conceded that this is a foreign substance that can only find its way into milk through some human agency. In view of the statement in the prevailing opinion that the record contains neither allega-

tion nor proof that formaldehyde is unwholesome, it may be well to take counsel of a few facts within the circumscribed field of judicial knowledge. Webster's International Dictionary defines formaldehyde as "a colorless, volatile liquid, resembling acetic or ethyl aldehyde and chemically intermediate between methyl alcohol and formic acid." The same lexicographer informs us that methyl alcohol is obtained by the distillation of wood, and this is the "wood alcohol" of commerce which, under our statutes, is required to be labeled as a deadly poison. Professor Reese, in his recent work on medical jurisprudence and toxicology, tells us that formaldehyde is a poison and it is so classified in Glaister's Medical Jurisprudence and Public Health and in Peterson & Haines Text Book of Legal Medicine. Having even this slight knowledge of the constituents of formaldehyde, it is not difficult to understand why it is used in embalming fluids, the purpose of which is to arrest decay of the human body after death. It is charged in the complaint that the formaldehyde found in the milk of the defendant was used as a preservative. That is simply another way of saying that this substance was used to prevent or delay chemical change. We know that human digestion consists in the chemical changes of the foods which are eaten, and it requires no stretch of the imagination to conclude that a substance containing the elements of wood alcohol and used in the preservation of dead bodies, cannot be otherwise than unwholesome when employed as a preservative of such food. The same elements that arrest decomposition also retard or prevent digestion. These general observations, thus briefly stated, indicate the point of view from which we should examine the rulings adversely criticised in the prevailing opinion.

This proceeding was initiated in the usual way. An agent of the agricultural department took two samples of milk from the defendant's cans, one of which was delivered to the state chemist and the other to the defendant. The subsequent analysis disclosed formaldehyde. A complaint was served charging that the defendant had used that drug as a milk pre-

servative contrary to the statute, and this charge was met by a general denial which was subsequently modified by a stipulation to the effect that the defendant had offered for sale the milk in question. Upon the trial the charge in the complaint and the analysis of the state chemist were established by evidence that stands uncontradicted and amply supports the directed verdict. When the prosecution had closed its case the defendant was sworn and, in the course of his examination, he was asked if he had used any preservative or formaldehyde, or any other foreign substance in his milk, or if he knew of any of these things having been used. In various forms similar questions were addressed to the defendant's hired man. All these questions were objected to, the objections were sustained and the defendant's counsel excepted. These are the rulings to be reviewed, and upon them depends the fate of this judgment.

The prohibition of the statute is that " no person shall sell or exchange, or offer or expose for sale or exchange, any unclean, impure, unhealthy, adulterated or unwholesome milk," etc., and the violation thereof is punishable by appropriate penalties. In the light of the statutory definition as to what constitutes adulteration, considered in connection with this prohibitory clause, it is obvious that there can be only two issuable facts in such a prosecution. The first is whether the milk is adulterated within the meaning of the statute, and the second is whether it was sold or exchanged, or offered or exposed for sale or exchange, by the person charged. Since the latter fact is admitted by the defendant in the case at bar, the only issuable fact we have to deal with is whether the milk sold by him was adulterated. In this connection it will be noticed that the effort of the defendant at the trial was to prove, not that the chemist's analysis was wrong or false, or that the sample of milk taken by the state agent contained no formaldehyde, but that the defendant and his hired man had put no formaldehyde into it, and that they did not know of any one else who had done so. It may be admitted that if guilty knowledge or intent were an essential

ingredient of this statutory offense, such evidence would, of course, be admissible to establish a defense to the charge of its commission. But this court has said "as the law stands, knowledge or intention forms no element of the offense. The act alone, irrespective of its motive, constitutes the crime." (*People* v. *Kibler, supra.*) That was the law in 1886 as established in *People* v. *Cipperly* (*supra*), and it is the law to-day, for there has been no change in the statutes or in the decisions of this court. Under the statute as construed in the decisions referred to, the "simple omission of things directed and the commission of things prohibited" is conclusive evidence of the violation of the law no matter how innocent of wrongful intent or knowledge the alleged offender may be. The thing prohibited by the clause of the statute above adverted to is the sale or exchange, etc., of adulterated milk; that is the act which, "irrespective of its motive, constitutes the crime." This is obviously a somewhat radical departure from that merciful consideration for the individual evinced by the common law, but it is to be borne in mind that the statute is the protest of organized society against intolerable conditions that demand heroic treatment and respecting which this court has said "it is notorious that the adulteration of food products has grown to proportions so enormous as to menace the safety and health of the people. Ingenuity keeps pace with greed, and the careless and heedless consumers are exposed to increasing perils. To redress such evils is a plain duty but a difficult task. Experience has taught the lesson that repressive measures which depend for their efficiency upon proof of the dealer's knowledge and of his intent to deceive and defraud, are of little use and rarely accomplish their purpose. Such an emergency may justify legislation which throws upon the seller the entire responsibility of the purity and soundness of what he sells and compels him to know and be certain." All this is conceded in the prevailing opinion to be the established law relating to the adulteration of milk by the addition of water, but by a flight of logic that I am utterly unable to follow the majority of my brethren are about to establish a distinction,

not to be found in the statute, between adulteration by water and other kinds of adulteration. Although it has been decided that when a man sells milk containing more than the statutory percentage of water, he may not be permitted to show how it happened, it is now to be decided that when a man sells milk containing a poisonous chemical he may be allowed to give evidence that he does not know anything about it. And the reasoning by which this result is reached is that since water is a natural constituent of milk and is sometimes produced by nature in excess of the statutory standard, it is entirely proper to prohibit the luckless vendor from proving that it was the cow and not he who was at fault. But when a foreign and poisonous element is found in milk the vendor should be permitted to show by circumstantial evidence, not that the milk was not thus adulterated, but that one or more individuals of all mankind did not do it. Let me state the proposition even more pointedly. When milk is simply weakened or diluted by water, which when pure is not deleterious, mere proof of that fact is irrebuttable evidence of a violation of the statute against a vendor, but when it is really adulterated by the addition of an unnatural and noxious drug the vendor may show by mere inference or suggestion that some one else not named may be the offender. It is argued in the prevailing opinion that " putting a foreign substance into milk is a physical act and may become an issuable fact under the statute." That " it is capable of proof by either direct or circumstantial evidence, and this proof may be met by showing that the direct evidence is false or by breaking the chain of circumstances." In what portion of the statute do my brethren find the authority for the statement that the physical act of putting a foreign substance into milk may become an issuable fact that can be proved or disproved by circumstantial evidence? The issuable facts that may be litigated under the statute are the adulteration of the milk and the attempt to vend the same. In this case the vending is admitted, and, hence, we are concerned only with the question of adulteration. That can only be

proved by direct evidence of a chemical analysis. It may be overthrown by other evidence of the same nature. When the facts of adulteration and vending are established, the particular agency by which adulteration is accomplished is neither issuable nor germane. Under the impending decision herein, convictions for this kind of adulteration will be rendered impossible unless some one is caught in the physical act or admits its commission. We know from experience that both are practically impossible. Where is there anything in the statute declaring that the physical act of adulteration by a foreign substance may become an issuable fact although the physical act of adulteration by water may not even be inquired into? The only issuable facts mentioned in the statute and contemplated by it, are those to which I have called attention, and if another is now added it must be by judicial importation. The fallacy of the argument which seeks to make an issuable fact of the "physical act" is easily illustrated by reference to another phase of the statute. Suppose, for instance, that the charge is that milk has been sold within the period of parturition. Evidence that the sale was not within the prohibited period would, of course, be competent and exculpatory. But would it be competent to show that although the sale was within the period, the owner of the cow or the vendor of the milk did not know that the period had not expired? How much protection would the statute afford the public against the vending of milk of that kind if such evidence could be given? How does that question differ in principle from the one about to be decided? The argument of my brethren is mainly based upon the assumption that the legislature intended to establish three different methods by which to conserve the health of the public in the regulation of the traffic in milk. In my judgment the statute contains no warrant for this assumption. It plainly contemplates only one method as applied to three conditions which produce (1) adulteration by dilution, (2) unwholesomeness because of parturition and other enumerated causes, and (3) adulteration by the addition of any foreign substance. As to this lat-

2

ter branch of the statute it may be said, in passing, that the "foreign substance" complained of in the case at bar does not come within the rule discussed in *People* v. *Marx* (99 N. Y. 377) and *People* v. *Biesecker* (169 N. Y. 53). I shall not discuss the extent of the alleged adulteration, because that is a question with which we are not concerned. If formaldehyde is capable of such infinitesimal diffusion that its presence may be chemically ascertained where it cannot be physically sensed; and if that is to be regarded as a justification for its use, the legislature is the tribunal to which appeal should be made.

In conclusion, I simply repeat that I can find nothing in the language of the law or in the canons of statutory construction that requires or justifies a rule of proof as to one of the offenses created by this statute that is not applicable to all. Neither is there any principle of logic or justice that can justify the decision about to be made if the *Cipperly* case and the cases that follow it are to stand as the law of the state.

The judgment herein should be affirmed.

CULLEN, Ch. J., GRAY, O'BRIEN and BARTLETT, JJ., concur with VANN, J.; HAIGHT, J., concurs with WERNER, J.

Judgment reversed, etc.