M. Marvin Berger, J.
“Oh * * * that mine adversary had written a book ” cries Job in the depths of his suffering. (Job, ch. XXXI, v. 35.)
. Job’s exclamation (in reality, a plea for a bill of particulars) goes unanswered. But, in this instant case, if the Corporation Counsel wishes to regard the exclamation as a hope that his adversary had made admissions against interest — his petition has been answered.
*662 For the defendant, Dr. Robert Atkins, has in fact written a book — “The Diet Revolution,” a phenomenal best seller, describing its author’s theories on weight reduction.
And the book supplies more than sufficient evidence of a willful violation by defendant of the New York City Health Code to warrant his being held for trial.
Dr. Atkins, a physician who specializes in the management of obesity, stands accused of violating five sections of the code (§§ 73.03, subd. [12], 75.05, subd. [1], 75.05, subd. [6], 71.05, and 75.13) in that he did “pack, possess, offer for sale or sell a banned drug and a removed food additive: Cyclamates.”
The charge, quoted from the summons, is amplified by an information and affidavits, sworn to, among others, by Health Department Sanitarians, Harry S. Smolowitz and Joseph Rizzo.
Rizzo, who suffers from obesity, was a patient of Dr. Atkins for a four-month period from October, 1972 to February, 1973. He swears that Dr. Atkins advised him that cyclamate sweeteners were good for his health, gave him printed recipes for cheese cake and custard containing cyclamates, gave him a printed price list for a cyclamate-eontaining substance described as “Dr. Atkins’ Sugar Substitute,” and directed him to the premises of Cumberland Packing Corp., in Brooklyn, where the sweetener was sold in 5-lb. bags bearing a label, reading in part: “ Robert C. Atkins, M. D. . . Artificial Sweetener . . Non-Caloric Sugar Substitute. . . . Cumberland Packing Corp., 2 Cumberland Street ”.
The ingredients listed on the label included 33.3% calcium cyclamate.
Mr. Smolowitz swore that Dr. Atkins was associated with Cumberland Packing Corp., and with its executive vice-president, Marvin Eisenstadt, and that subsequent to August 27, 1970, when the Food and Drug Administration of the United States Department of Health, Education and Welfare banned the use of cyclamates, the defendant committed the following violations of the Health Code, in that he did:
(1) Pack, possess, offer for sale or sell a food — an artificial sweetener which was adulterated (§ 73.03, subd. [12]) because it contained cyclamate, an unsafe food additive, in violation of section 71.05 of the code.
(2) Pack, possess, offer for sale or sell a drug as defined by section 73.07 of the code, misbranded in violation of subdivision (1) of section 75.05 of the code because its label said that the sweetener, containing cyclamate, should be used by diabetics and the obese, when, in fact, the marketing of cyclamate sweet *663 eners had been prohibited by the Federal Food and Drug Administration.
(3) Pack, possess, offer for sale or sell a drug misbranded in violation of subdivision (6) of section 75.05 of the code, because it failed to inform users of unsafe dosage and because of absence of adequate evidence of safety or effectiveness, all of which violated section 71.05 of the code.
(4) Hold, offer for sale or sell the sweetener, a new drug, for which no application was effective under the Federal Food, Drug and Cosmetic Act (U. S. Code, tit. 21, § 301 et seq.) or article 137 of the New York State Education Law, and not labeled “ For Investigative Use Only,” in violation of section 75.13 of the code.
On October 21, 1969, by an order of the United States Food and Drug Administration (34 Federal Register 17063), cyclamates were ordered removed from the Gras (generally recognized as safe) list of food substances. However, a later order dated December 31,1969 (34 Federal Register 20426), noted that the Medical Advisory Group on Cyclamates, established by the Assistant Secretary for Health and Scientific Affairs, had reviewed all available data on cyclamates and unanimously agreed that under appropriate medical management of diabetics and patients, whose health depended on weight reduction and control, “ Cyclamates provide medical benefits which outweigh their hazards. ’ ’ The report recommended that cyclamates be made available for such patients on medical advice and on a nonprescription, drug-labeled basis.
On August 24, 1970, an order signed by the Commissioner of Food and Drugs and published in the Federal Register (35 Federal Register 13644), revoked drug-labeling for cyclamates, based on a new report by the Medical Advisory Group, which concluded that ‘ ‘ in the absence of adequate evidence of safety and effectiveness, continued sale of cyclamate-containing products with drug labeling can not be permitted. ’ ’
It is not within this court’s competence to decide whether the Food and Drug Administration order resulted from intense lobbying by sugar interests as charged by the defendant, or came about only after public pressure and because of the Food and Drug Administration’s “ procrastinations and prevarications ” (see Michael F. Jacobson, “ Eater’s Digest — The Consumer’s Fact Book of Food Additives ” (Doubleday, 1972), and James S. Turner, “ The Chemical Feast ■ — the Ralph Nader Study Group Report on Food Protection” (Grossman, 1970), and because of evidence that cyclamates caused bladder cancer, birth *664 defects and mutations in test animals. Suffice it to say that the decision to ban cyclamates was taken in full accordance with the authority vested in the Food and Drug Administration.
At the hearing before this court, Eisenstadt testified that on September 1, 1970, Dr. Atkins wrote him: “ Would you please be so kind as to make available for these individuals (many patients who because of their desperate medical problems of diabetes and low blood sugar cannot function without a palatable artificial sweetener) the old cyclamate sweetener that use [sic] to be called ‘ Par-Ev ’ providing these people would go to your facilities in person. ’ ’
Dr. Atkins went on to authorize use of his name on the labeling, ‘ ‘ so that an interested observer can know that this is done for medical reasons. I consider this a service to my patients and I am in no way interested in any form of financial remuneration.”
Eisenstadt testified that from September 1,1970 to about January, 1973, he had conversations with Dr. Atkins, who requested that he supply patients with Par-Ev. Cumberland Packing Co. sold Par-Ev in 5-lb. packages at the rate of about 25 lbs. per week. Over the period in question, he marketed over a ton of the substance. He said: “It was just understood that when the doctor sent his patients down to my plant I would sell them the product for their own use ’ ’.
■Cumberland Packing Corp. pleaded guilty earlier this year, in this court, to the same violations charged against Dr. Atkins, and was fined $5,000.
At the hearing, Rizzo testified that late in October, 1972, when he became a patient of Dr. Atkins, the defendant diagnosed Rizzo as a diabetic and told him to use a sweetener containing cyclamate. Asked by Rizzo whether the sweetener was bad, Atkins allegedly replied: “No — it’s good for your digestion.”
Rizzo received a price list for Dr. Atkins’ sugar substitute, containing instructions to make a check payable to Cumberland Packing Corp., and promising delivery of mail orders within three weeks. At the end of the price list appear the words “ Dr. Robert Atkins, Cumberland Packing Corp., 2 Cumberland Street, Brooklyn, N. Y. 11205 ”.
Rizzo received the recipes previously mentioned and when he inquired about more recipes, Dr. Atkins suggested that Rizzo buy his book ‘ ‘ The Diet Revolution, ’ ’ which was received in evidence as People’s Exhibit 6.
A 5-lb. package of sweetener containing cyclamates, with a label similar to People’s Exhibit 2, was received in evidence *665 as People’s Exhibit 7. Rizzo testified that a sign in the defendant’s office stated: “ Dr. Atkins only recommends this sweetener described by the doctor — Atkins Sugar Substitute.”
Mr. Smolowitz testified that Eisenstadt led him to a room in the Cumberland plant where Dr. Atkins’ artificial sweetener was stored in 5-lb. bags. He embargoed a little less than 500 lbs. of the substance on February 21, 1973, and destroyed the embargoed sweetener on May 22.
There is no evidence that Dr. Atkins shared in the proceeds of the sales by Cumberland.
Defendant moved to dismiss on the grounds that the defendant did not “pack, possess, sell or offer to sell” the forbidden sweetener.
His attorney stated at the end of the hearing: 1 ‘ What we do have here is a prescribing by a doctor. That is not a violation. The doctor has a right to prescribe. Perhaps there may be a question as to the ethics of a doctor to prescribe that which has been banned as dangerous food additive or drug by the F. D. A. But ethics does not play a part here. The question here is whether he violated the Health Code, and more particularly, those sections set forth in the summons, and that evidence does not exist.”
In his memorandum of law, defendant asserts that the prosecution addressed itself to the question of whether Dr. Atkins offered to sell the cyclamates. But, he asserts, Dr. Atkins made no offer to sell but merely suggested, recommended and prescribed ; it was Cumberland which offered the cyclamate for sale; Cumberland was the seller and the patient was the buyer; ‘ ‘ the only act of which Dr. Atkins can be found guilty is the impropriety of recommending to his patients an artificial sweetener containing cyclamates, which had been banned by an order of the Food and Drug Administration. ’ ’
The defense position is as deficient in substance as cyclamate is lacking in nutritional value, for there is sufficient, evidence that Dr. Atkins acted in an accessorial capacity.
Section 20.00 of the Penal Law headed “ Criminal liability for conduct of another ’ ’ states: ‘ ‘ When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.”
‘ ‘ Culpability ’ ’ and ‘ ‘ Conduct ’ ’ are defined in section 15.00 of the Penal Law.
*666 Cumberland Packing Corp. engaged in the criminal conduct of selling cyclamates at defendant’s request. The defendant solicited, commanded, importuned and intentionally aided that conduct.
The proof is imbedded in the book mentioned earlier in the opinion, ‘ * The Diet Revolution. ’ ’ Copyrighted in 1972, the book states that the sugar industry “ spent vast sums of money and lobbied tirelessly to discredit cyclamates,” with the result that “ in October, 1969, they got the F. D. A. to bar cyclamates ”. And at page 161 of his book, he writes: “I would prefer that all my patients use cyclamates if it were possible, for the simple reason that they are far superior in taste to saccharin alone. But it is illegal to manufacture or sell them in this country, even when a doctor is willing to prescribe them. For the moment, try to find cyclamates, if you can. They are still available in some foreign countries.”
At page 246 of the book, Dr. Atkins published a recipe — his “Illegal, But not Immoral or Fattening Cheese Cake” (obviously derived from that well-known saying: ‘1 Everything I like is either illegal, immoral or fattening,”), one of the ingredients of which is “ artificial sweetener containing cyclamates, equal to 30 teaspoons of sugar.” A footnote, connected by an asterisk to the title of the recipe for this delicacy, reads: ‘ ‘ For those of you who have been foresighted or fortunate enough to have kept a supply of cyclamate sweetener on hand we are including the recipe which throughout the years has been our most successful.”
The defendant’s conduct is not merely incidental to the offense of Cumberland’s sale of the sweetener (Penal Law, § 20.10) but forms the nexus between Dr. Atkins’ patients and the purveyor of the substance. He fathered the plan, arranged with Cumberland to service his patients, distributed price lists and permitted use of his name on the label.
Lesser included offenses might well be criminal solicitation in the third degree, in violation of section 100.00 of the Penal Law (with intent that another person commit a crime, he solicits, requests, commands, importunes or otherwise attempts to cause such person to engage in such conduct), or conspiracy in the fourth degree (Penal Law, § 105.00) in that “with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct.”
According to the Practice Commentary to section 20.00 of the Penal Law by Richard S. Denzer and Peter McQuillan (McKin *667 ney’s Cons. Laws of N. Y., Book 39, p. 32), that section restates the principle of accessorial liability embodied in the sixth paragraph of section 2 of the former Penal Law which made a person a principal when, even though absent from the scene of a crime, he procured, counseled or aided in the commission — in short when he met the common-law definition of an accessory before the fact. (See People v. Corbalis, 178 N. Y. 516.)
As stated in People v. Henry (18 A D 2d 293, 296): “ under the definition of ‘ principal ’ in section 2 of the Penal Law, there is no longer any distinction in this State between persons who aid and abet others to commit a crime and those who directly commit it. They are both equally declared to be principals. Under this statute, proof that one aided and abetted in the commission of a crime is sufficient to sustain a conviction under an indictment charging him with having directly committed the crime, and vice versa. (People v. Bliven, 112 N. Y. 79; People v. Corbalis, 178 N. Y. 516, 523 [concurring opinion]; People v. Katz, 209 N. Y. 311, 325-326.)”
And in People v. Tomasello (48 Misc 2d 156, 157-158), Murder, J. states: “ A person who aids and abets in the commission of a crime is a principal and a party to the crime (Penal Law, §§ 2, 26). He is equally guilty with the one he aids and abets and can be indicted, tried and convicted of the crime. (People ex rel. Guido v. Calkins, 9 N Y 2d 77; People v. Kief, 126 N. Y. 661.)”
It is of course true, as stated by Burke, J. in People v. La Belle (18 N Y 2d 405, 412 [quoting from 1 Burdick, The Law of Crimes, § 221]), that an aider or abetter must share the principal actor’s purpose, and there must be community of purpose before a partnership in a criminal act can be charged to the accessory;
Defendant relies on People ex rel. Maher v. Potter (112 N. Y. S. 298), to sustain his contention that willfulness was a necessary ingredient of the information and of the proof required at the hearing. He asserts that section 12-b of the Public Health Law prescribes imprisonment for one year or a fine not exceeding $2,000 or both for a person who willfully violates any regulation established by a public office or board where no other punishment is prescribed.
The Maher case involved defendant’s violation of a section of the Yonkers Sanitary Code by housing lodgers in a substandard building. The court held that the offense might be a misdemeanor under the Penal Law or the Yonkers City Charter, both of which specifically required that the act in violation must have *668 been willfully performed and citing Wass v. Stephens (128 N. Y. 123).
The Wass case concerned an action for malicious prosecution based on the allegation that the defendant, in his capacity as a complainant in a criminal proceeding, charged the plaintiff with 1 ‘ wilfully or maliciously ’ ’ removing a water main or pipe.
In sustaining a jury verdict for the plaintiff, the Court of Appeals held that the jury was justified in concluding that defendant had no reasonable cause for believing in the truth of the charge he made in the criminal proceeding. Judge Andrews wrote (128 N. Y. 123, 128-129): “ The word ‘ wilfully ’ in the statute means something more than a voluntary act, and more also than an intentional act which in fact is wrongful. It includes the idea of an act intentionally done with a wrongful purpose, or with a design to injure another, or one committed out of mere wantonness or lawlessness.”
The definition in the Wass case is outdated. Section 15.05 of the present Penal Law defines the mental states required to ascertain culpability. The Practice Commentary on the section, as found in McKinney’s Penal Law (p. 22) notes that the law now designates four culpable mental states to replace “ a host of largely undefined and frequently hazy adverbial terms, such as ‘ intentionally’, 1 wilfully ’, ‘ designedly ’ ”.
The terms ‘ ‘ intentionally ’ ’ and ‘ ‘ knowingly ’ ’ as defined in section 15.05 fully cover the situation here.
Now subdivision 2 of section 15.15 of the Penal Law, construing statutes with respect to culpability, states that if the proscribed conduct necessarily involves a culpable mental state for the commission of the offense, such culpable mental state may be considered an element of the offense, although not specifically required by the wording of the statute defining a crime. Also, a statute defining a crime, ‘ ‘ unless clearly indicating a legislative intent to impose strict liability, should be construed as defining a crime of mental culpability.” (Penal Law, § 15.15, subd. 2.)
Although the court finds adequate evidence of willfulness to warrant defendant being held for trial, the defendant would be answerable even if this element were absent. For, although subdivision 2 of section 12-b of the Public Health Law provides punishment by way of a maximum fine of $2,000, or imprisonment for one year, for a person willfully violating any regulation established by a public office or board under authority of the health laws, where punishment for a violation is not other *669 wise prescribed, subdivision 4 of section 1706 of the New York City Charter (formerly section 558) provides: “ Any violation of the health code shall be treated and punished as á misdemeanor.”
The word ‘£ willful ’ ’ is conspicuous by its absence from the Charter language and by its presence in section 564-6.0 of the Administrative Code, headed £ £ Penalties, ’ ’ providing that every person willfully doing or omitting to do any act or thing, which by law subjects the offender to punishment for a misdemeanor, is liable to a penalty of $250, to be recovered by the Department of Health in any civil tribunal (emphasis supplied).
Section 55.10 (subd. 2, par. [b]) of the Penal Law states that any offense defined outside the Penal Law, which is declared by law to be a misdemeanor, without specification of classification or of the sentence therefor, shall be deemed a Class ££ A ” misdemeanor, for which the maximum penalty is $1,000 or onevear imprisonment.
The provisions of the Health Code are strict liability laws. The principle, stated in People v. Swift & Co. (286 N. Y. 64, 68-69 [Finch, J.]), although there applied to food, relates to other substances as well. It reads: “ the courts have recognized that * # * repressive measures which depend for their efficiency upon proof of guilty knowledge on the part of the dealer and of his intent to sell unhealthy food are of little practical use. Thereafter it was repeatedly held that violations of food laws are not excused by lack of guilty intent or by mere good faith on the part of the violator. (People v. Bowen, 182 N. Y. 1.) This rule is not confined to New York and is of almost universal application. (26 C. J. tit. £Food,’ p. 765; 11 Ruling Case Law, tit. £ Food ’, p. 1129.) The effect of these cases has been to throw upon the seller of foodstuffs the burden of selling unhealthy food at his peril. In Hobbs v. Winchester Corporation ([1910] 2 K. B. 471, 481) it was said: £ Who is to take the risk of the meat being unsound, the butcher or the public! ’ ” (To the same effect is People v. Philip Lewis Egg Prods., 197 Misc. 212.)
And as stated by City Magistrate Mobbis Weinfeld in People v. Miller (31 Misc 2d 1067, 1068): “the power to eliminate mental intent or consciousness of wrongdoing is valid when applied to situations and laws respecting intoxicants, narcotics, the sale of adulterated food, the maintenance of nuisances, and safety, health and welfare laws * * * discrimination, and other like situations not involving an isolated act of negligence without involving immorality. (Armour Packing Co. v. United *670 States, 153 F. 1, affd. 209 U. S. 56; City of New York v. Hewitt, 91 App. Div. 445; People v. D’Antonio, 150 App. Div. 109; People ex rel. Price v. Sheffield Farms-Slawson-Decker Co., 225 N. Y. 25.) ”
In United States v. Dotterweich (320 U. S. 277, 284-285), Justice Frankfurter stated: “ The offense is committed * * * by all who do have such a responsible share in the furtherance of the transaction which the statute outlaws, namely, to put into the stream of interstate commerce adulterated or misbranded drugs. Hardship there doubtless may be under a statute which thus penalizes the transaction though consciousness of wrongdoing may be totally wanting. Balancing relative hardships, Congress has preferred to place it upon those who have at least the opportunity of informing themselves of the existence of conditions imposed for the protection of consumers before sharing in illicit commerce, rather than to throw the hazard on the innocent public who are wholly helpless. ’ ’
To the same effect are the "numerous annotations collected at Ann. 152A.L.B. 755.
In summary then:
(1) The court finds that the defendant must be held for trial on charges of violating the New York City Health Code.
(2) The basis for holding the defendant is the strict liability provisions (cf. Penal Law, § 15.10) of the Health Code which characterize such offenses as misdemeanors, and which are deemed Class “A” misdemeanors by section 55.10 (subd. 2, par. [b]) of the Penal Law.
(3) If the defendant is correct in his argument that the offenses are of a character requiring charge and proof of wilfullness, pursuant to section 12-b of the Public Health Law, that element was present in the language of the information and the hearing testimony, in sufficient quantity to hold the defendant for trial. However, if convicted under section 12-b of the Public Health Law, the financial penalties would be double those involved if the defendant were convicted under the Administrative Code — a maximum fine of $2,000 rather than $1,000 for each offense.
(4) The City Charter gives the Department of Health jurisdiction to enforce the laws covering health protection. It may enforce the provisions of the Health Code, as well as the Public Health Law, and that power includes the right to define criminal offenses (People v. Blanchard, 288 N. Y. 145).
The defendant is held for trial.