THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* EMIL LAESSER, Respondent.

*Adulterated milk — the fairness of the test, when not a question for the jury — the provision as to the "mixed milk of the herd of cows" not applicable to a peddler — intent to adulterate, when not material — evidence as to herd sample not having been taken.*

In an action to recover a penalty for selling adulterated milk in violation of section 22 of the Agricultural Law (Laws of 1893, chap. 338, as amd. by Laws of 1900, chap. 101) it appeared that the defendant had obtained a quantity of milk from the producer thereof and was engaged, through his agent, one Vaughan, in selling the same about the city of Rochester; that there were two cans of milk upon the wagon, one a thirty-two-gallon can and the other a ten-quart can containing six quarts; that, while Vaughan was engaged in delivering milk to customers from the ten-quart can, two inspectors in the employment

of the Department of Agriculture made a lactometer test of the milk in the can and immediately thereafter requested Vaughan to stir the milk thoroughly. Vaughan did so and the inspectors then took two samples therefrom and delivered one to Vaughan and the other to the State Chemist. A subsequent chemical analysis of the sample delivered to the State Chemist showed that it was adulterated within the meaning of section 20 of the Agricultural Law, and the correctness of this analysis was not impeached.

Vaughan testified that he stirred the milk " good " before starting on his trip that morning, but had no recollection of just how the milk was taken for the samples. There was no other proof upon this subject.

*Held,* that it was improper for the court to submit to the jury any question as to the fairness of the taking of the samples of milk;

That the provision of the statute requiring the taking of a sample of the "mixed milk of the herd of cows" from which the milk claimed to be adulterated was drawn did not apply to a peddler who was not the producer, but only to the producer;

That, in the absence of any testimony impugning the fairness of the samples or the correctness of the analysis, evidence that the defendant had not tampered with the milk was incompetent as the question of intent to adulterate was immaterial;

That evidence that no herd sample of the milk of the person who produced the milk furnished to the defendant had been taken, was incompetent.

McLENNAN, J., dissented.

APPEAL by the plaintiff, The People of the State of New York, from a judgment of the County Court of Monroe county in favor of the defendant, entered in the office of the clerk of the county of Monroe on the 28th day of January, 1902, upon the verdict of a jury, and also from an order entered in said clerk's office on the 28th day of January, 1902, denying the plaintiff's motion for a new trial made upon the minutes.

In this action to recover a penalty for selling adulterated milk it appeared that at the time the samples of milk were taken, there was, in addition to the ten-quart can from which the samples were taken, a thirty-two quart can upon the defendant's wagon.

*Eugene J. Dwyer,* for the appellant.

*John A. Bernhard,* for the respondent.

SPRING, J.:

This action was brought to recover a penalty for selling adulterated milk in violation of section 22, chapter 338 of the Laws of 1893,

as amended by chapter 101 of the Laws of 1900. Section 22 provides that "no person shall sell or exchange or offer or expose for sale or exchange any unclean, impure, unhealthy, adulterated or unwholesome milk   *   *   *   ." Section 37 of the original act (as amd. by Laws of 1900, chap. 559) prescribed penalties for a violation of these provisions.

On the 13th day of September, 1900, the defendant by his agent, one Vaughan, was selling milk about the city of Rochester. Two inspectors in the employ of the Department of Agriculture of the State made a lactometer test of the milk in a small peddling can containing about six quarts, and immediately thereafter caused it to be thoroughly stirred, and then took two samples therefrom, sealing them up as required by the statute, and immediately delivered one to the agent of the defendant who was peddling the milk, and the other to the State Chemist. A subsequent chemical analysis of this milk delivered to the chemist showed that it was adulterated within section 20 of chapter 338, referred to, and which defines adulterated milk. The analysis showed that the percentage of water was eighty-eight and fifty-six one-hundredths, and of solids eleven and forty-four one-hundreths.

The question was submitted to the jury as to the fairness of the taking of the samples of milk. The witness Vaughan, who was the agent of the defendant, testified that he was delivering the milk to the defendant's customers when the samples were taken by the inspectors, and that he continued to do so thereafter. The two inspectors testified as to the manner in which the samples were taken; that one of them requested Mr. Vaughan to stir the milk thoroughly, which he did, and after this was done the milk composing the samples was poured in the bottles. Vaughan testified that he stirred the milk "good" before starting on his trip that morning, but had no recollection of just how the milk was taken for the samples. There was no other proof given upon this subject, and the correctness of the analysis of the chemist was not impeached. There was, therefore, no question of fact from this evidence to be submitted to the jury as to the fairness of the samples taken. While this action is to recover a penalty, it is still a civil action, and if the evidence is undisputed or at least is not fairly susceptible of an inference against the positive testimony of the witnesses, there is no question of fact

to be submitted to the jury. It has been held that even the credibility of a party when his evidence is explicit, and without any suspicion or unusual circumstance tending to show its improbability, does not inflexibly require the submission of the case to the jury. (*Hull* v. *Littauer*, 162 N. Y. 569.)

We appreciate that in several cases the question of the fairness of the sample was submitted to the jury, and that ordinarily in actions of this character that question is one of fact. But in each of those cases there was some independent evidence tending to impeach the fairness of the sample.

When milk is delivered by the producer "for manufacture, sale or shipment, or from a milk vendor who produces the milk which he sells," and it is designed to prosecute such producer, the statute (§ 12, as amd. by Laws of 1898, chap. 557) provides for taking a sample of the "mixed milk of the herd of cows" from which the milk claimed to be adulterated was drawn. That is, the statute aims to prevent offenses by the original producer, and also by any person who sells unwholesome milk. In the larger cities the great bulk of the milk is not sold by the producers. It is shipped to the city, mixed indiscriminately, and sold by peddlers from house to house. It is impossible, therefore, in the latter case to make any test of the milk to be compared with that from the herd. There is no unfair discrimination for or against any one. Whoever sells milk not up to the arbitrary standard prescribed by the statute is liable for the penalty provided by section 37 of the act as amended. Every producer, as an extra guard against unjust prosecution, may have the milk of his herd compared with that which is claimed to be unwholesome, and that privilege relates to the manner of ascertaining the quality of his milk. The statute gave no such privilege to the peddler who was not the producer, because no herd sample could be obtained. The statute was passed in view of existing conditions and must be construed in a way to be fairly adapted to them.

The illustration in the opinion of Justice McLENNAN of the farmer whose milk is divided at a street corner is an unusual one. It may be that if the milk came direct from the producer to the peddler, and was sold by him unmixed with any other, that a fair construction of the statute would permit him to have the comparative test made with that from the herd.

It is to be noted in construing this statute that milk which comes from the herd is not likely to be adulterated within the statutory definition. The standard fixed is on the assumption that milk which does not conform to it in quality is unwholesome and not suitable for human consumption, and we can hardly conceive of a herd of cows, whatever may be their food and however emaciated or poorly cared for they may be, whose milk product is within the condemnation of the statute. If such an exceptional instance exists it must yield to the general welfare of mankind for whose benefit the law was enacted. It is also to be understood that the lawmakers are seeking to check the sale of unhealthy milk, and in one instance provided a means for making the test, and the method there provided may not be applied to a peddler, because the conditions are not the same, and the distinction is not due to an attempt to legislate in behalf of the farmer and against the peddler.

In *People* v. *Wiard* (61 App. Div. 612) the decision was based upon the fact that the delivery of the milk was to a single purchaser. Eight cans of the milk had been taken by the producer to the railroad station, and the sample tested was from only one of these cans. That sample was compared with a sample from the herd. It might well be that no fair comparative test could be made of a sample from a distinct part of the milk with the mixed milk of the whole herd. In the present case the peddler was engaged in selling milk from the smaller can when apprehended by the inspectors. The sample was taken from the can out of which he was selling the milk. The peddler may have a dozen cans of milk on his wagon; he may have disposed of the greater part of it. The reason for mixing the entire milk together does not obtain in his case for two reasons — the milk is not to be tested with that from the herd, and it would not be feasible to do so, for a part may already have been sold by him and the mixing would be impracticable or impossible. If the milk he has in the can from which he is selling is stirred properly and proves to be below the standard the liability attaches. The *Wiard* case has no application to milk taken from a peddler.

Upon the trial of this action, and under the objection of the plaintiff, the defendant was permitted to show by the defendant and his wife that they had not tampered with this milk. We think this evidence was incompetent. If the fairness of the sample or

the correctness of the analysis had been impugned in any way, the evidence might be competent as bearing upon either of those questions, but it is not permissible in and of itself, and without any other proof attacking the plaintiff's case, to raise a question of fact and thus secure a submission of the case to the jury. If testimony of this character is to be received, then the purpose of this salutary statute will be thwarted. If this rule obtains and the sample shows the milk very badly adulterated, containing water largely above the margin prescribed by the statute, the defendant may always make a question of fact by stating that he or those in charge of the milk had not interfered with it. The offense at which the statute aims is *selling or exposing for sale* adulterated milk, and the statute has defined what constitutes adulteration. The only requisite to a cause of action is proof of a sale of this kind. (*People* v. *Kibler,* 106 N. Y. 321.)

The injurious effects which may result from drinking impure milk, the difficulty in detecting its impurities by the customers, the enormous extent to which it enters into the food supply, and the temptation to adulterate it, render it essential that the purpose of the statute be adhered to somewhat inflexibly by the courts.

In the present case Zuber, who furnished the milk to Laesser, may have added water or some ingredient to the milk, so that the testimony of the defendant or his wife proves nothing. And yet the defendant, though innocent, is amenable to the payment of a penalty if he sells milk which comes within the condemnation of the statute. Milk sold throughout a city may often change hands several times before reaching the consumer, and it would impair the efficiency of the statute to allow the last seller to be exonerated by swearing to his own honesty. It would likewise create confusion and uncertainty to permit each person who has sold the milk to exculpate himself by proof of this kind unless there is some evidence, or some reasonable inference, that the samples were unfairly taken or the analysis is unsatisfactory.

We are aware that proof of this kind has been given in actions for penalties for delivering impure milk to a cheese factory or creamery, as has been stated, but a different method obtains in a case of that kind, as samples must be taken from the herd of the producer, and the statute (§ 12 as amd. by Laws of 1898, chap. 557)

minutely provides how this shall be done, and seems to imply that it may be shown that such milk "was just as it came from the cow" when delivered to the factory. Milk, however, is delivered about the cities by peddlers and non-producers of the milk, and the feature of the statute applicable to dairymen would not be practicable as applied to these peddlers.

It appeared on the trial that the milk was obtained from one Zuber, who delivered it at the station of the New York Central and Hudson River Railroad Company in Rochester. The defendant was permitted to show that no herd sample of Mr. Zuber's milk was taken. This evidence was objected to and an exception taken. We think the evidence was incompetent. As already suggested, the necessity of taking samples of the milk from the herd is not required where milk is delivered about the city.

This court has already held that this statute is constitutional. (*People* v. *Hills*, 64 App. Div. 584.)

The question of intent does not enter into actions of this kind. (*People* v. *Kibler*, 106 N. Y. 321.)

The judgment and order should be reversed and a new trial granted, with costs to the appellant to abide the event.

WILLIAMS and HISCOCK, JJ., concurred; McLENNAN, J., dissented in an opinion; DAVY, J., not voting.

McLENNAN, J. (dissenting):

It seems to me that the decision of this court in the case of *People* v. *Wiard* (61 App. Div. 612; affd., 170 N. Y. 590) furnishes the rule of law applicable to the case at bar, and should be regarded as controlling upon this court and as decisive of this case. The rule laid down in the *Wiard Case (supra)* was stated in the following language, namely: "Held, that the analysis of a sample of milk taken from only part of the product delivered by the producer at any one time to a single purchaser, will not afford a basis for an action for a penalty under the Agricultural Law (Laws of 1893, chap. 338)."

The statement of the rule is clear and unambiguous, and its meaning ought not to be doubtful; yet when the facts of the *Wiard* case and the questions which were there involved are recalled, perhaps the exact meaning of the decision is made even more apparent.

In the *Wiard* case the defendant, on the 8th day of June, 1899, delivered eight cans of milk, produced upon his farm, at the railroad station in Markham, in the county of Monroe. One of the inspectors in the employ of the Agricultural Department of the State, after thoroughly stirring the contents of a single can of milk, took three samples from such can and sealed two of them, one of which he delivered to the defendant and the other to a chemist for analysis; the unsealed sample was kept by the inspector. Samples were also taken from the other cans, but, so far as appears, were not delivered to the chemist or analyzed. The chemist analyzed the sample delivered to him and found the percentage of water by weight to be eighty-eight and fifteen one-hundredths per cent; total solids, eleven and eighty-five one-hundreths per cent; fat, two and ninety-four one-hundredths per cent. On the 13th day of June, 1899, the inspectors went to the barn of the defendant and took a sample of milk of his entire herd, after it had been thoroughly mixed, and such sample was delivered to the chemist. Upon analysis it was found to contain eighty-seven and ninety-four one-hundredths per cent water; total solids, twelve and six one-hundredths; fat, three and fourteen one-hundredths per cent; so that it will be seen that the sample taken at the railroad station contained twenty one-hundredths more water, twenty one-hundredths less solids, and twenty one-hundredths less fat than the sample of milk taken at Wiard's barn. In that case it was not contended that the analysis was not properly made; that the samples were not taken in all respects as required by law, except that the sample taken at the railroad station was not taken from the entire quantity of milk delivered, after it had been mixed. Upon that state of facts, and passing upon that single question, this court held — which decision was unanimously affirmed by the Court of Appeals — that the analysis of the sample taken at the railroad station, although showing such an inferior quality of milk as compared with the sample taken at defendant's barn, was not proper to be even considered as a basis for a recovery against the defendant, under the Agricultural Law, for the sole reason that the sample had not been taken from the entire quantity of milk after the contents of the eight cans had been mixed, and it was held that the plaintiff's complaint in that case was properly dismissed by the learned trial court. A minority

of the court at the Appellate Division, as appears by the decision, was of the opinion that under all the circumstances it was a question of fact for the jury whether or not the sample taken at the railroad station was a fair sample, and that if found to be a fair sample it could be considered by the jury in determining whether the defendant in that case had adulterated and offered for sale adulterated milk; but such view was not thought to be tenable by a majority of the court, or by the Court of Appeals.

In the case at bar the defendant, through his hired man or agent, was, on the 13th day of September, 1900, engaged in selling milk in the city of Rochester. He had upon the wagon two cans of milk, one a thirty-two-gallon can and the other a ten-quart can, which, at the time in question, contained three or four quarts of milk. As the defendant's agent came out of a restaurant or saloon in which he had been delivering milk out of the smaller can, an inspector of the Agricultural Department, after stirring the milk in the small can, took two samples of milk from it, sealed them, delivered one to the defendant's agent and the other to Mr. Latimer, the chemist. The chemist analyzed the sample delivered to him, and found that it contained eighty-eight and fifty-six one-hundredths per cent water; eleven and forty-four one-hundredths solids and three and four one-hundredths fat, showing that the milk was at least as good as the milk taken at the railroad station in the *Wiard* case. It appears that the three or four quarts of milk from which the sample was taken was not sold to or intended for a single purchaser, if that may be considered material. But in the *Wiard* case it in no manner appeared that the eight cans of milk were sold and delivered to or intended for a single purchaser. In fact, it was alleged in the complaint in that case, was admitted in the answer, and was in no manner controverted by the evidence, that the defendant was engaged at the time in question in selling and delivering milk to various *dealers* in the city of Rochester.

In this case we simply have the analysis of the chemist of the sample taken from one of two cans upon defendant's wagon, which can contained about three quarts of milk, from which the defendant's agent had been selling from time to time, yet it is held in substance in the prevailing opinion that upon such analysis alone the defendant shall be held, as matter of law, guilty of a violation of

the Agricultural Law, and liable for the penalty imposed, notwith-standing it appears by the uncontradicted evidence that unadulterated milk, in the condition in which it comes from the cows, may fall below the standard prescribed by the State; and notwithstanding it further appears that in milk which has been permitted to stand, as the milk in question had stood, the fats rise to the top, and thus it would naturally be first removed from the can.

Whatever our individual views may have been prior to the decision of this court and the Court of Appeals in the *Wiard* case, it seems to me that it ought now to be regarded as settled that an analysis of a sample of milk taken as was the one in question, cannot be made the basis of a recovery against a defendant charged with selling adulterated milk. The suggestion that such holding will render the law difficult of enforcement, or in effect nugatory, ought not to be regarded as of importance, when the statute, as interpreted by the court of last resort, is plain and unambiguous. The Legislature is charged with the duty of formulating a statute that is practical and enforcible, and not the court.

In the *Wiard* case it was held that it would not answer to take a sample of milk for analysis from one of eight cans, notwithstanding the fact that such analysis was corroborated by the analysis of another sample taken from the milk of the entire herd. We, therefore, are unable to see how it will answer to say in this case that the analysis of a sample taken from one of two cans will serve such purpose, and that it may be made the basis of a recovery against the defendant.

There is nothing in the case at bar to show that the milk which was being offered for sale by the defendant was not in precisely the same condition as it was when it came from the cows, and we think, until evidence is produced tending to show that the defendant's milk was adulterated, he ought not to be held liable for the penalty prescribed by the statute. It was for the very purpose of avoiding such a condition of things, in the case of a producer of milk, that the further provision was added to the statute requiring the milk of the herd to be examined, so that it might be determined whether or not it had been adulterated.

It cannot be possible that the statute means, when properly interpreted, that if the farmer who produced the milk in question had

sold it all to the defendant, the analysis as made in this case could not form the basis of an action against the farmer; but that as against the defendant, the purchaser of the milk, who was engaged in selling it in precisely the same condition as it was when received, such analysis, as matter of law, entitles the plaintiff to recover. Yet such is the precise effect of the two decisions. A farmer, a producer of milk, sells and is about to deliver eight cans of milk at one time to a single purchaser; a sample is taken by an inspector from one of the cans, who procures it to be analyzed and it is found to be below the standard prescribed by the State. Clearly, under the decision in the *Wiard* case, such a decision cannot form the basis of an action against the farmer, solely because the contents of the eight cans were not mixed and the analysis was not of a sample of the mixed product.

Under the decision of the court in the case at bar, if the purchaser of the eight cans of milk attempts to sell it to the inhabitants of a city, a like sample may be taken from the same can, the same analysis made showing the same result, and such analysis, as matter of law, is sufficient to entitle the People to recover from the purchaser of the eight cans of milk the full penalty prescribed by the statute. In other words, a farmer may sell with impunity milk below the standard, where and when he pleases, and wholly without reference to what its analysis may show, provided only it is of a quality which his cows actually give, when not improperly fed. But a person who may buy the same milk and attempt to resell it, if an analysis shows it is below the prescribed standard, is, as matter of law, liable for the penalty named in the statute. Presumably the statute was enacted for the protection of the consumers of milk, and not for the purpose of enabling the State to punish one class of its citizens for selling a quality of milk which another class may perchance sell without restraint. If the decision in this case and in the *Wiard* case correctly interpret the statute, there is much force in the contention of defendant's counsel that the act is unconstitutional, for the reason that it discriminates in favor of vend ers of milk produced by them as against sellers of milk which is purchased and is not produced by such sellers. To prove that such discrimination may exist under the statute as interpreted, no more apt illustration can be made than that suggested by defend-

ant's counsel. A farmer milks from his cows milk which is below the standard, say forty gallons of it; all is thoroughly mixed and is of precisely the same quality; he takes it to the city to sell, and at a certain street corner he sells twenty gallons to a milk peddler who immediately goes along the street from house to house selling the milk which he has purchased. The farmer goes in the opposite direction, also going from house to house, selling the remaining twenty gallons of milk. A sample of the milk being sold by each is taken by the State's inspectors. The analysis of each sample is identical, and shows that both are below the standard. The farmer cannot be prosecuted, notwithstanding the analysis, because the quality of the milk is exactly the same as when it comes from his cows. The milk peddler, on the other hand, would be liable as matter of law under the decision in this case, solely because the analysis of the sample of the milk taken from him showed it to be below the standard. However, in this case it is only necessary to hold that whether or not the sample taken from the defendant was a fair sample is a question of fact for the jury.

The learned county judge allowed the certificate of the chemist to be received in evidence, and he submitted to the jury the single question whether, under the circumstances disclosed by the evidence, the sample taken was a fair sample, stating to the jury that if they found it was, then the plaintiff could recover, but if they found it was not a fair sample, their verdict should be for the defendant. We think the instruction was as favorable to the plaintiff as it was entitled to.

The jury, by its verdict in this case, found that the agent of the Agricultural Department did not take a fair sample when he took it from what remained in the bottom of the ten-quart can, when there was a thirty-two-gallon can of milk upon the same wagon, and I think the verdict was amply supported by the evidence.

These views lead me to conclude that the judgment and order appealed from should be affirmed, with costs, upon the authority of *People* v. *Wiard* (61 App. Div. 612; affd., 170 N. Y. 590).

Judgment and order reversed and new trial ordered, with costs to the appellant to abide event, upon questions of law only, the facts having been examined and no error found therein.