VAN BRUNT, P. J., O'BRIEN, HATCH and LAUGHLIN, JJ., concurred.

Judgment reversed and new trial ordered.

---

## Supreme Court—Appellate Division—Fourth Department.

### March, 1905.

### THE PEOPLE v. CHARLES A. BEAMAN.

#### (102 App. Div. 151.)

1. ADULTERATION OF MILK—INSPECTION OF NOT LIMITED TO DEPARTMENT OF AGRICULTURE.

No exclusive right is conferred by the Agricultural Law upon the Commissioners of Agriculture and his assistants of taking samples of milk and instituting prosecutions where the milk is below the statutory standard, and such inspection may be instituted by city health inspectors based upon samples procured by them from milk cans upon defendants' wagons.

2. SAME—TRIAL—EVIDENCE OF SUBSEQUENT TEST OF HERD SAMPLE INADMISSIBLE.

Upon such a prosecution defendant is not entitled to introduce in evidence the test if a herd sample of his milk taken by inspectors subsequent to the taking of the samples upon which the prosecution was based, as the only herd sample recognized by statute is that specified by section 12 of the Agricultural Law, and relates only to a civil action for a penalty and to a herd sample taken by the Commissioner of Agriculture or his representative.

3. SAME.

The Legislature has the right to affix the character of an "adulterated" production to milk falling below a certain standard, and to prohibit the sale of such adulterated milk under the penalty of a criminal prosecution which would not be defeated by proof that the milk had not been actually adulterated after leaving the cow or by the ignorance or good intentions of the persons selling the milk.

4. SAME.

The Legislature also had the right as it saw fit to impose or not an additional liability for the sale of adulterated milk, in the form of a penalty to be recovered by civil action and without altering or impairing the criminal liability, to provide that in certain cases the additional civil liability should not be enforced.

APPEAL by the defendant, Charles A. Beaman, from a judgment of the County Court of Monroe county in favor of the plaintiff, entered in the office of the clerk of the county of Monroe on the 5th day of October, 1904, upon the verdict of a jury affirming a conviction of the defendant before a police justice of the city of Rochester and a jury, upon a charge of having sold adulterated milk in said city.

The defendant was charged with selling impure, unhealthy and adulterated milk in violation of the Agricultural Law of the State of New York.

John A. Bernhard, for the appellant.

Robert Averill and S. J. Warren, for the respondent.

HISCOCK, J.: The learned county judge, in a carefully pre-
pared and very complete opinion, has set forth the reasons which
led him to an affirmance of defendant's conviction, and we
agree with him in the conclusion reached in favor of such af-
firmance.*

The defendant was a producer and peddler of milk in the
city of Rochester. May 23, 1903, two inspectors of the health
department cf said city took samples from the peddling can
from which he was then supplying customers, and also from two
other cans upon his wagon. The samples were so taken
after the milk had been fully stirred, in duplicate, one being
given to the defendant and the other retained by the inspectors.
This prosecution was based upon the sample taken from the
peddling can, and there was no dispute in the evidence that it
fell below the standard. A few days after taking the samples
the inspectors went to defendant's farm and took a herd sample.
The defendant desired, but was not allowed to, show upon the
trial the standard of such herd sample.

Two reasons are urged for the reversal of the conviction
which deserve consideration:

*First.* It is insisted that under the Agricultural Law the duty
and exclusive right is conferred upon the Commissioner of Ag-
riculture and his assistants of taking samples of milk and insti-
tuting prosecutions where the milk is below the statutory stand-
ard. This proposition, if correct, of course leads to the other
one that the inspectors of the city of Rochester had no right to
institute this prosecution. We are unwilling to adopt this con-
struction of the statute. Long before the Agricultural Law
was passed and the Department of Agriculture created, laws
were in force defining and under the penalty of criminal prose-
cution prohibiting the sale of adulterated milk. Of necessity
the institution of these proceedings was left to persons other
than a State department or official because the latter did not
exist charged with any such duty. When the Agricultural

* See page 89, *postra.*

Law (Laws of 1893, chap. 338) was adopted it is true that a special department was created to look after its enforcement. We find in various sections certain expressions to the effect that said department " shall be charged with the execution of the laws relating to agriculture and agricultural products " (sec. 2), and again that the Commissioner of Agriculture " may cause an action or proceeding to be brought in the name of the people for the recovery of " penalties (sec. 8). And there are still other sections which confer upon the Commissioner and his officers and agents certain facilities for inspection and for procuring evidence. (Secs. 3, 6, 7, 12.) It certainly would be a very radical departure, even if permissible, for the Legislature to withdraw from all officers throughout the State charged with the investigation and prosecution of criminal offenses, from grand juries and individuals, the right to procure and present evidence of a misdemeanor and to confer it upon one official. The courts would require very clear evidence of the legislative intent to attempt to inaugurate any such policy as this, even if it could be legally carried into effect. An inspection of the entire statute referred to fails to convince us that the Legislature had any intention of making this attempt. While it was the undoubted purpose to confer upon the department created general oversight over the subject therein provided for and to impose upon it and its officers and agents the special duty of securing an enforcement of the law, it is plain that there was and is nothing in this intention and the provisions resulting therefrom which excludes the right to institute such a prosecution as this in the manner in which it was done.

We pass to the second criticism made by defendant upon his conviction because evidence was excluded of a herd sample, his contention being that if this sample had not been superior in standard to that taken by the inspectors a defense would have been presented to this prosecution. This argument is based upon the amendment made by chapter 557 of the Laws

of 1898 to section 12 of the Agricultural Law, which provided that when a sample of milk had been taken by the Commissioner of Agriculture or his representative "with a view of prosecuting the producer of such milk for delivering, selling or offering for sale adulterated milk, the said Commissioner of Agriculture or assistant, or his agent or agents, shall, within ten days thereafter, with the consent of the said producer, take a sample in a like manner of the mixed milk of the herd of cows from which the milk first sampled was drawn. . . . If the sample of milk last taken . . . shall upon analysis prove to contain no higher percentage of milk solids, or no higher percentage of fat than as the sample taken at the creamery, factory, platform or other place, then no action shall lie against the said producer," etc.   The appellant argues that it could not have been the intention of the Legislature to deny to a defendant in a criminal prosecution for selling adulterated milk all of the defenses which would have been available in a merely civil action for penalties, and that, therefore, he should have been allowed to prove, if possible, as a defense to this proceeding the fact of a herd sample not better than the sample taken by the inspectors and which would have been a bar to an action by the Commissioner of Agriculture for a penalty.

Of course, this contention involves purely and simply a construction of the statute which the Legislature has adopted.   It is fully settled that it had the right to affix the character of an "adulterated" production to milk falling below a certain standard, and to prohibit the sale of such adulterated milk under the penalty of a criminal prosecution which would not be defeated by proof that the milk had not been actually adulterated after leaving the cow or by the ignorance or good intentions of the person selling the milk.   (People v. Kibler, 106 N. Y. 321, 7 N. Y. Crim. 23; People v. Cipperly, 101 id. 634, 3 N. Y. Crim. 385; 4 id. 69.)

It is also perfectly certain that the Legislature had the right as it saw fit to impose or not an additional liability for the sale of adulterated milk in the form of a penalty to be recovered by civil action. Having the power to provide a criminal liability and to add or not a civil liability by way of penalty, we know of no reason why it would not without altering or impairing the criminal liability provide that in certain cases the additional civil liability of a penalty should not be enforced, and the query is whether it has not effected just this result by providing that a herd sample under certain circumstances should be a bar to a civil action.

It was by chapter 554 of the Laws of 1897 that the provision of section 408a of the Penal Code (added by Laws of 1893, chap. 692, and amd. by Laws of 1894, chap. 426) making the sale of adulterated milk a misdemeanor, was transferred to and became part of section 37 of the Agricultural Law. Said latter section as so amended, and as amended by chapter 656 of the Laws of 1901, clearly and unqualifiedly makes any person violating section 22 of said Agricultural Law (as amd. by Laws of 1900, chap. 101), by selling adulterated milk as defined by section 20 thereof guilty of a misdemeanor. It authorizes a criminal proceeding instituted by and in behalf of the people. Section 12 of the Agricultural Law, already referred to, provides for the taking of a herd sample by the Commissioner of Agriculture or his representative, and that when this sample is of a certain standard "no action shall lie." The "action" contemplated is clearly a civil one for a penalty, and we do not think that any reasonable construction of the language used could interpret it as applying to or prohibiting a criminal prosecution under section 37.

There is another practical obstacle to the construction claimed by appellant. Under the statute the only herd sample recognized as a bar to a prosecution is one taken by the Commissioner of Agriculture or his representative. Those officials

alone are authorized and empowered to take it, and the sample so taken by one of them is alone recognized under the law. No inspector of the city of Rochester or private individual is authorized to take such a sample; and if we are right in our conclusion that such an inspector may take a sample of milk being peddled and institute a prosecution for the selling thereof when below the standard, such proceeding is not qualified or affected by the provision for taking a herd sample within a certain length of time which in terms applies only where the Commissioner of Agriculture or his representative has taken a sample for the purpose of prosecuting a civil action. The herd sample taken by the Rochester inspectors had no more relation to the sample upon which this prosecution is based than would a herd sample taken by the defendant or any other individual. The statute does not recognize it or give it any efficacy for the purposes claimed by defendant.

Therefore, it seems to us for all these reasons that no error was committed in ruling out evidence of the herd sample.

Some complaint is made by defendant of the manner in which the sample was taken from his can, but we think this question has already been passed upon by us in People v. Laesser (79 App. Div. 384). It is also said that the police justice did not properly or fairly instruct the jury. The counsel for the defendant took one or two specific objections to something said or done by said justice which are not tenable. He took a general objection to the entire charge, and it is well settled that this was not a sufficient or proper basis for presenting any alleged error. (People v. Hodnett, 68 Hun, 341, 10 N. Y. Crim. 390; Arnold v. People, 75 N. Y. 603.)

Moreover, a review of the entire charge does not disclose to us any substantial error committed at the expense of the defendant's rights.

The judgment of conviction should be affirmed.

All concurred.

Judgment of conviction affirmed.

*The following is the opinion of Hon. ARTHUR E. SUTHER-LAND, County Judge:

SUTHERLAND, J.: Certain milk inspectors of the health department of Rochester met the defendant May 23, 1903, while he was peddling milk on his route in said city, and the inspectors took a sample from the peddling can that defendant carried into the houses of his customers. On his wagon were other cans containing milk, and the peddling can was filled from time to time from the larger cans. The inspectors testified that they thoroughly stirred the milk in the peddling can before taking the sample. The chemical analysis of the sample of the peddling can showed solids eleven and fifty-six one-hundredths per cent., fats two and ninety-eight one-hundredths per cent., water eighty-eight and forty-four one-hundredths per cent. The statute* forbids the offering or exposing for sale of milk containing less than twelve per centum of milk solids or less than three per centum of fats, or more than eighty-eight per centum of water or fluids. Samples were not taken from all the cans on the wagon but were taken from three cans; one of the other samples was below standard and the third sample was above.

The defendant produced the milk that he sold, and the inspectors afterwards visited his dairy and took a sample of the milk from his herd, which was analyzed. On the trial of the case in the Police Court the defendant, having testified that the milk which he sold was just as it came from the cows, without anything being added thereto, offered to show that the herd test was no higher than the sample upon which the prosecution was based, which evidence was not received, on the ground that it was immaterial; and the principal question presented on this appeal is whether that evidence as to the result of the herd test should have been received. The proposition contended for by the defendant is that where a test of the milk of the herd shows

* Agricultural Law (Laws of 1893, chap. 338), §§ 20, 22, as amd. by Laws of 1900, chap. 101.—[REP.

that it is of no higher standard than that offered for sale, it tends to prove that there is no actual adulteration in that offered for sale, and that under the amendment to section 12 of the Agricultural Law passed in 1898 (Laws of 1898, chap. 557, hereafter quoted) there can be no prosecution of this defendant under such circumstances. Section 12, as amended in 1898, provides in this respect as follows: "When the Commissioner of Agriculture, an assistant commissioner, or any person or officer authorized by the commissioner, or by this chapter, to examine or inspect any product manufactured or offered for sale shall in discharge of his duties take samples of such product, he shall before taking a sample, request the person delivering the milk . . . to thoroughly stir or mix the said milk before the sample is taken." (The only person authorized to examine or inspect milk by that chapter is the Commissioner of Agriculture, or a person or officer authorized by him.) Further the section says: "In taking samples of milk for analysis at a creamery, . . . or other place where the same is delivered by the producer for manufacture, sale or shipment, or from a milk vendor who produces the milk which he sells, with a view of prosecuting the producer of such milk for delivering, selling or offering for sale adulterated milk, the said Commissioner of Agriculture or assistant or his agent or agents, shall, within ten days thereafter, with the consent of the said producer, take a sample in a like manner of the mixed milk of the herd. . . . If the sample of milk last taken by the Commissioner of Agriculture or his agent or agents, shall upon analysis prove to contain no higher percentage of milk solids, or no higher percentage of fat than as the sample taken at the creamery, . . . or other place, then no action shall lie against the said producer." This language does not refer and plainly was not intended to apply to a person instituting a criminal prosecution for selling milk below the required standard, who is not a member of the staff of the Commissioner of Agriculture.

It has been held by this court in two other cases (not reported, People v. Brewer and People v. Seeley), that this provision of section 12 of the Agricultural Law for the taking of herd tests in the amendment of 1898 is intended only for the Commissioner of Agriculture and his assistants, and relates only to actions commenced and prosecuted by that official or his agents, and that a herd test is not an essential preliminary to a prosecution for misdemeanor when the sample on which the prosecution is based is not taken by an appointee of the Commissioner and the prosecution is not instituted by the Commissioner. For the purposes of a prosecution under the Agricultural Law the inspectors of the health department of Rochester are not put under any further obligation by the amendment of 1898 than a private citizen is who may choose to prosecute an offender for selling milk below the standard. And an analysis of a herd test made by the city inspectors is of no more importance or materiality than an analysis made by a chemist, employed by the defendant, of a sample of the product of his dairy.

Although the obligation was not placed by the statute upon the inspectors of the health department of Rochester to take any herd test before commencing a criminal action against the defendant, those inspectors actually did obtain a sample from defendant's herd, analyzed it, and the defendant offered to show that the herd sample, although below the standard provided by the statute, was nevertheless no better in quality than the milk which was in his peddling can from which he was supplying his customers when met by the inspectors. Does this relieve the defendant from liability? Assuming that this evidence would tend to show that the milk complained of was the actual product of his dairy without the addition or admixture of any water or fluid or foreign substance, would that fact if fully established relieve defendant from prosecution for the misdemeanor of selling milk below the standard fixed by the Agricultural Law?

A re-examination of some of the statutory provisions before 1898 may aid us in determining the scope which the Legislature intended to give to the amendment of 1898, upon which the defendant relies for his exoneration. By chapter 467 of the Laws of 1862, as amended by chapter 544 of the Laws of 1864, it was made a misdemeanor to knowingly sell or offer for sale any impure, adulterated or unwholesome milk; and also it was made a misdemeanor to feed cows any food that produces impure, diseased or unwholesome milk; and it was declared that the addition of water or any substance other than a sufficient quantity of ice to preserve the milk while in transportation to market, was an adulteration, and any milk obtained from animals fed on distillery waste or upon any substance in a state of putrefaction or fermentation was declared to be impure and unwholesome. In 1881, on the adoption of the Penal Code,* it was made a misdemeanor by section 407, with intent that the same may be sold as unadulterated or undiluted, to adulterate or dilute any milk, distilled spirits or malt liquor, or any drug, medicine, food or drink for man or beast; or, knowing that the same has been adulterated or diluted, to offer for sale or to sell the same as unadulterated or undiluted. No arbitrary chemical standard of purity or wholesomeness was fixed by these statutes, and knowledge of the actual character of the product was an essential element of the offense.

But by chapter 202 of the Laws of 1884 an arbitrary standard of purity or wholesomeness for milk was designated, and it was made a misdemeanor to sell or offer or expose for sale any milk below that arbitrary standard, and the prosecutor under that act was relieved from the necessity of showing that the defendant had knowledge of the impure condition of the milk or that it was below the standard fixed by the statute. Section 13 of that act provided in part as follows: " In all prosecutions under this act relating to the sale and manufacture of

---

*Laws of 1881, chap. 676.—[REP.

unclean, impure, unhealthy, adulterated or unwholesome milk, if the milk be shown to contain more than eighty-eight per centum of water or fluids or less than twelve per centum of milk solids which shall contain not less than three per centum of fat, it shall be declared adulterated."

Civil actions for penalties were not provided for in the act of 1884 or the preceding acts, and there would seem to be no question about the right of any person to act as the complainant or prosecutor in courts exercising criminal jurisdiction against any one charged with the misdemeanor of selling milk of a kind forbidden by those acts. The law concerning dairy products was further amplified by chapter 183 of the Laws of 1885, as amended by chapter 223 of the Laws of 1887 and other amendments, under all of which the sale of milk below the fixed chemical standard was declared to be a misdemeanor. And there can be no doubt that under those supplemental acts the prosecution for the misdemeanor could be instituted by any one. It was held in numerous cases under those acts that it was immaterial whether the milk which was sold and proved to be under the standard came directly from the cows without the addition of any other substance; and that lack of knowledge of the inferior quality did not excuse the seller who was bound to see to it that the product he offered to the public was up to the standard. (People v. Cipperly, 37 Hun, 324, 3 N. Y. Crim. 385, 4 id. 69, dissenting opinion adopted by the Court of Appeals, 101 N. Y. 634; People v. Kibler, 106 id. 321, 7 N. Y. Crim. 23.)

In the dissenting opinion of Mr. Justice LEARNED at General Term in the Cipperly case, he refers to the fact as well known and assumes that the Legislature had that fact in mind when framing this law, that cows may be fed in such a manner as to produce a large quantity of milk the quality of which is inferior and deleterious, and that the Legislature had chosen to call "adulterated" any milk below the statutory standard for the purpose of prosecution under the statute of 1884. He

held, substantially, that this law did not merely lay down a rule of evidence of adulteration, but created a new offense, namely, of offering for sale milk below that standard which the Legislature in its wisdom determined to be the standard required for the protection of the food supply of the people. Hence he held that it was an immaterial fact whether the milk had been actually diluted or adulterated by the addition of some substance after it came from the cows or not, as in either case the Legislature, within its proper constitutional rights, had determined that the sale of such product should be forbidden and punished as a misdemeanor. This reasoning was adopted by the Court of Appeals as its view of the statute under consideration. A discussion of this case and others of a similar nature is found in a footnote in volume 54 of the Central Law Journal at page 351. In People v. Eddy (12 N. Y. Supp. 628), decided in 1891, the General Term of the Fifth Department held that the fact that the milk was just as it came from the udders of the cows was immaterial under the statute of 1884 then in force.

Civil actions for penalties were not provided for in the act of 1884, but it seems were permitted for the first time under the act of 1885 at the suit of the Dairy Commissioner or any of his assistants in the name of the people. When the present Agricultural Law was passed (Laws of 1893, chap. 338) the same chemical standard of purity was retained, and section 20 of the Agricultural Law, which is contained in article 2 of the statute, declares milk not conforming to that standard to be adulterated.

An examination of that section shows that the Legislature has chosen to group under the term "adulterated milk" not only milk which has been actually diluted with water or any other fluid or into which has been added some foreign substance, but also to include under that term any milk which contains more than eighty-eight per centum of water or fluids, and any

milk containing less than three per centum of fats, or less than twelve per centum of milk solids, and any milk drawn from cows within fifteen days before and five days after parturition, and any milk drawn from animals fed on distillery waste or any substance in a state of fermentation or putrefaction or on any unhealthy food, or any milk drawn from cows kept in a crowded or unhealthy condition, or any milk from which any part of the cream has been removed; and this section declares that " all adulterated milk shall be deemed unclean, unhealthy, impure and unwholesome." The term " adulterated " then is used by the Legislature in this act, not in its ordinary sense of impure because of the admixture of a foreign or baser substance, but as a convenient term to cover all milk that for the causes named is declared by this statute to be improper as a subject of sale for food (just as Mr. Justice LEARNED in the Cipperly case said the Legislature had employed the word in the statute then under consideration), and section 22 of the statute (as amd. by Laws of 1900, chap. 101) absolutely forbids the sale, offering or exposing for sale of any " unclean, impure, unhealthy, adulterated or unwholesome milk."

The Agricultural Law when passed in 1893, although by section 22 absolutely forbidding such sale, did not in itself contain a provision declaring the sale of milk below the standard fixed by that act to be a misdemeanor; but civil actions for penalties to be brought by the Commissioner of Agriculture were provided for by sections 8 and 37. But the Legislature did not intend to make the sale of milk below the standard of the Agricultural Law any less a crime than. it was before, for by chapter 692 of the Laws of 1893 section 408a was added to the Penal Code declaring it to be a misdemeanor to violate any of the provisions of article 2 of the Agricultural Law (which includes section 22), and by chapter 426 of the Laws of 1894 this provision of the Penal Code making such sales a misdemeanor was amended and re-enacted. By chapter 554 of the Laws of

1897, section 408a of the Penal Code was amended so as to leave out of that section the provision making the violation of article 2 of the Agricultural Law a misdemeanor, that provision being transferred by that act to section 37 of the Agricultural Law where, as amended by chapter 656 of the Laws of 1901, it is now to be found. Against the seller of milk below the standard there could be two methods of punishment followed under the Agricultural Law as it stood after the amendment of 1897. First, by prosecuting the offender in a criminal court for misdemeanor, which prosecution could be instituted by any citizen; and, second, by a civil action for a penalty, which could only be brought in the name of the people under the direction of the Commissioner of Agriculture.

Under the law as it stood then, prior to the enactment of the amendment of 1898 quoted above (which provides for the taking of a herd test after samples are taken by the agents of the Commissioner of Agriculture from a dealer who is exposing milk for sale which his own herd has produced), there could be no question but that the defendant in this case could have been properly convicted upon the evidence presented before the Police Court, notwithstanding the fact that the milk sold may have been the unchanged product of his dairy.

Has the amendment of 1898 changed the entire legislative policy of the State on the subject of the sale of milk below the chemical standard of the Agricultural Law? If the defendant's contention is right, then any producer is immune from punishment if he shows by a chemical analysis that the ordinary product of his herd is no better than the kind of milk he peddles to his customers, although that is far below the standard. The only way that he could be prosecuted under the State law for such an offense, if this contention were sound, would be by affirmative proof that he was feeding his cows upon a kind of food forbidden by the statute, which might be a very difficult thing to prove in many cases if the poor milk itself is not con-

sidered sufficient proof of improper feeding. I do not think the Legislature intended to throw down the bars and permit the sale of milk below the standard, even though there is no actual dilution or admixture of the milk with other substance after it comes from the dairy. The more reasonable view of the amendment of 1898 seems to me to be that thereby the Legislature intended to prevent the multiplying of penalties at the suit of the Commissioner of Agriculture against a producer, provided the herd test taken by the Commissioner's agents shows the sample offered for sale to be no worse than the milk actually taken from the cows. The statute only makes provision for a herd test in case samples are taken from the dealer by the agents of the Commissioner of Agriculture, for he alone can multiply penalties by bringing civil actions in addition to criminal prosecutions. The Legislature might well have thought that the Agricultural Department of the State government should not through its agents become the instrument of too rigorous and oppressive an accumulation of both civil and criminal penalties by providing, as has been done, that no action shall be brought by the Commissioner where a herd test taken by him or his deputies discloses the fact that the milk offered for sale by the producer, although below the standard, was not inferior in quality to the actual product of his dairy. The liability of a dairy keeper to prosecution for misdemeanor for offering such milk for sale at the instance of some other complainant is not cut off by the words of the statute and in my opinion that liability still exists. Any other construction of the amendment of 1898 would destroy a very valuable safeguard to the public health, and would impute to the Legislature an intention to change its settled and approved policy by the use of inappropriate and doubtful language.

There was sufficient proof in this case of the offering for sale of the milk in the peddling can. It was held in People v. Koch

(19 Misc. Rep. 634, 12 N. Y. Crim, 250), that where a milk man is going his daily rounds in his cart it is sufficient evidence of the fact that he is offering and exposing for sale the milk that he has on his wagon. Sufficient evidence was given that the sample taken was a fair sample of the milk offered for sale. (People v. Laesser, 79 App. Div. 384.)

It is claimed that the only fair sample of the milk offered for sale by the defendant would be a composite sample taken from the contents of all the cans on his wagon. This does not seem to be tenable, in view of the fact that the milk which he was at the moment dealing out to his customers was contained in the peddling can from which the sample was taken on which the prosecution is based. This claim is somewhat at variance with the main proposition contended for, namely, that the defendant should have been allowed to prove that the milk in the peddling can was better or as good as the average milk produced by the defendant's herd. The objection that the sample taken from the peddling can was not fair because the contents of all the cans on the wagon were not intermingled is based upon the assumption that the average of all of those cans containing the product of his herd would have been better than the sample from the peddling can on which the prosecution is based.

Some expressions of the police justice, if specifically excepted to, might have given occasion for argument in this court, but there was no specific exception taken to such remarks; there was a general exception to the full charge. As this charge contained several propositions, some of which were manifestly correct, the general exception to the whole charge raises no question to be considered on appeal. (People v. Hodnett, 68 Hun, 341, 10 N. Y. Crim. 390; Arnold v . People, 75 N. Y. 603.)

The judgment is affirmed.