## PEOPLE v. BUTLER.

(Supreme Court, Appellate Division, Fourth Department. November 15, 1910.)

1. FOOD (§ 3*)—INSPECTION—MODE—MILK.

Laws 1898, c. 557, § 1, providing that an officer before taking a sample of milk for inspection shall request the person delivering the milk to thoroughly stir or mix the milk, does not require that the product of two milkings delivered at the same time be mingled; a sample from the entire product of one milking being sufficient.

[Ed. Note.—For other cases, see Food, Dec. Dig. § 3.*]

2. FOOD (§ 16*)—ADULTERATION—ACTION FOR PENALTY—QUESTION FOR JURY.

Though, in an action for a penalty for the sale of adulterated milk, the question of the fairness of a sample taken for inspection is for the jury, yet where evidence that the milk delivered in two cans was hoisted by cranes and poured into the weighing can, and that the officer then requested the person delivering it to stir it thoroughly, which he did with a dipper "seven or eight times in a rotary way" was not contradicted, the court properly directed a verdict in accordance with the results of examination of the sample taken.

[Ed. Note.—For other cases, see Food, Dec. Dig. § 16.*]

3. FOOD (§ 16*)—ADULTERATION—ELEMENTS OF OFFENSE—INTENT.

In an action for a penalty for delivering adulterated milk to a cheese-factory, it is no defense that nothing has been added to or taken from the milk from the time it came from the cows till it was delivered at the factory.

[Ed. Note.—For other cases, see Food, Dec. Dig. § 16.*]

Williams, J., dissenting.

Appeal from Trial Term, Erie County.

Action by the People against David Butler. From a judgment for plaintiff for $187.99 damages and costs, after a trial and direction of a verdict, defendant appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Wallace Thayer, for appellant.

Charles M. Stern, Deputy Atty. Gen., for the People.

SPRING, J. The action is to recover a penalty for delivering adulterated milk to a cheese factory. The defendant is a farmer in Erie county with a dairy of 40 cows, and in 1902 was delivering its product to a full cream cheese factory at Chaffee, in said county. About 8 o'clock on the morning of May 21st of that year one Murray, who was the agent of the defendant, delivered four cans of milk from the defendant's herd to this factory. The cans were of the capacity of 30 gallons each, two containing the milk of that morning, while in the other two, containing about 40 gallons, weighing 372 pounds, was the milk produced the evening before. The morning's milk was emptied into the weighing can and tested with the lactometer, and it was then all run out of the can. After that the milk in the two cans containing the night's milk was poured into the weighing can. There were present an Assistant Commissioner of Agriculture of the State and another agent of that department, who handed Murray a dipper and told him to stir the milk thoroughly, which he did with the dipper

"seven or eight times in a rotary way," and the agent again applied the lactometer, which showed that the milk was adulterated. He placed a quantity of this milk, after it was mixed, into a jar from which he took duplicate samples, filling two bottles, properly labeling, sealing, and numbering them, and gave one to Murray, directing him to deliver it to the defendant, which he did, and later the state agent gave the other to the state chemist. Section 1, c. 557, Laws 1898.

Adulterated milk, so far as pertinent to this case, as defined by the statute means (1) milk containing more than 88 per centum of water; or (2) less than 12 per centum of solids; or (3) less than 3 per centum of fats. A subsequent analysis of the sample of the defendant's milk delivered to the state chemist disclosed that it contained 89.12 per cent. of water, 10.88 per cent. of solids and 2.82 per cent. of fats. In each of the three particulars mentioned the milk was adulterated. In other words, the analysis disclosed, taking the maximum per centum of water permissible for wholesome milk as the basis, that 10 per centum or 4 gallons of water above this maximum was in the defendant's milk when delivered at the factory. On May 29th two agents of the state agricultural department were at the farm of the defendant, saw the milking done, and with his consent took a sample of the mixed milk of the entire herd of cows, delivering a duplicate sample of the milk to the defendant and retaining one (section 1, c. 557, Laws 1898), which an analysis demonstrated was wholesome milk. The milk product from which the samples were taken at the factory had been placed in three cans as it was drawn from the cows at the defendant's farm the evening preceding its delivery at the factory. These cans were placed in a tub of cold water, the covers removed for the night, and in the morning this milk was emptied into two cans, which were carried to the factory.

It is the contention of the defendant's counsel that all the milk of the defendant delivered to the factory should have been commingled and the sample taken from this mixture, instead of from the night's milk alone. Section 12, referred to in defining how the inspection of milk offered for sale shall be conducted, provides that, when the officer making the examination "shall in discharge of his duties take samples of such product, he shall before taking a sample, request the person delivering the milk or who has charge of it at the time of inspection, to thoroughly stir or mix the said milk before the sample is taken. * * * The person taking the sample of milk for analysis shall take duplicate samples thereof." The statute does not in terms prescribe that the two milkings shall be mixed before the sample is taken.

In People v. Wiard, 61 App. Div. 612, 69 N. Y. Supp. 1142, affirmed on grounds stated in memorandum below (170 N. Y. 590, 63 N. E. 1120), the producer delivered eight cans of milk to a railroad station for a single purchaser. The sample of milk which was analyzed was from one can. This court in overruling the plaintiff's exceptions made the following memorandum:

"Held, that the analysis of a sample of milk taken from only part of the product delivered by the producer at any one time to a single purchaser will not afford a basis for an action for a penalty under the agricultural law."

All the milk contained in the eight cans was produced that morning, so there was no mixing of all the milk. The sample taken from the one can of eight would not enable a fair comparison to be made of this milk with the product of the herd of the producer, which is an imperative requirement. The statute is specific in requiring the sample of the herd at the farm to be from the mixture of the entire product of the herd. In order to make this comparative test effective, the first sample must be from all the milk of one milking when thoroughly stirred.

In the Wiard Case it was from only a part of the herd. It was not a sample of all delivered from one milking. In the present case all of one milking was mixed, and a sample taken from it, so that it is not within the condemnation of the Wiard Case. Here the fair comparative test could be made. In the winter time the farmer may deliver to the factory at one time the product of half a dozen milkings, each in cans by itself. It cannot be that, in order to obtain a fair sample, all of this product of several days must be commingled. The producer is protected if the one milking is mixed conformably to the statute and its other provisions observed. He then has the entire product of one milking at the farm compared with one entire milking delivered at the factory.

It is claimed on behalf of the defendant that it is difficult, and the defendant's expert says well nigh impossible, to reunite the ingredients of the milk after the cream has raised over night. It would add still more to this difficulty if the two or more milkings were inter-mixed.

At the close of the entire evidence the trial judge directed a verdict for the plaintiff for $50, the least sum to be awarded for a violation of this statute. Section 37, Agricultural Law, as amended by chapter 656, Laws 1901. The defendant's counsel asked "to go to the jury on the whole case," and claims now that the fairness of the sample was a question of fact for the jury. The night's milking was poured from the two large cans into the weighing can four or five feet below. Each can was elevated by means of a crane above the weighing can, and then tipped over, letting out the milk which would fall in a large volume and with a rush. The momentum caused by 20 gallons of milk falling into this weighing can followed by another like quantity would cause the mass to be mingled together thoroughly. The defendant's agent was requested to stir this milk thoroughly, and the two witnesses who testified on the subject say he thoroughly stirred it, describing the manner in which it was done. Murray was not sworn. These agents were engaged in the inspection of milk at that factory from 7 o'clock until 8:30 that morning, yet no one disputed their testimony. Ordinarily the question of the fairness of the sample taken is one for the jury to pass upon. This is not an invariable rule, however. People v. Laesser, 79 App. Div. 384, 79 N. Y. Supp. 470. The method of taking the sample may be established like any other fact. If the proof shows that the specific requirements of the statute were strictly complied with, and with no countervailing proof, there is no question for the jury.

In People v. Weaver, 116 App. Div. 594, 101 N. Y. Supp. 961, the inspector did not request the person delivering the milk to thoroughly stir it, and, in fact, he only "gave the milk two or three turns with the dipper," and this court held that whether the sample was a fair one was for the jury. It did not lay down the proposition that in every case that question must be submitted to the jury. The trend of the opinion is the other way.

Upon the trial, the defendant sought to show in several ways that nothing had been added to or taken from the milk from the time it came from the cows until the time it was delivered at the factory. This class of evidence was excluded, an exception taken, and these rulings are now claimed to be error. The offense consists in delivering to the factory milk not conforming to the arbitrary standards prescribed by the Legislature. The intent of the defendant and whether he tampered with the milk is immaterial, and he cannot exculpate himself by proof of that kind. People v. Kibler, 106 N. Y. 321, 12 N. E. 795; People v. Cipperly, 101 N. Y. 634, 4 N. E. 107, reversing 37 Hun, 319, on dissenting opinion delivered below. People v. Beaman, 102 App. Div. 151, 92 N. Y. Supp. 295; People v. Laesser, 79 App. Div. 384, 388, 79 N. Y. Supp. 470 et seq.; People v. Bosch, 129 App. Div. 660, 114 N. Y. Supp. 65. In People v. Beaman, 102 App. Div. 151, 92 N. Y. Supp. 295, supra, the court in referring to the power of the Legislature used this language at page 160 of 102 App. Div., at page 297 of 92 N. Y. Supp.:

"It is fully settled that it had the right to affix the character of an 'adulterated' production to milk falling below a certain standard, and to prohibit the sale of such adulterated milk under the penalty of a criminal prosecution which would not be defeated by proof that the milk had not been actually adulterated after leaving the cow or by the ignorance or good intentions of the person selling the milk."

So in People v. Laesser, 79 App. Div. 384, 79 N. Y. Supp. 470, supra, it was said:

"Upon the trial of this action, and under the objection of the plaintiff, the defendant was permitted to show by the defendant and his wife that they had not tampered with this milk. We think this evidence was incompetent. If the fairness of the sample or the correctness of the analysis had been impugned in any way, the evidence might be competent as bearing upon either of those questions, but it is not permissible in and of itself, and without any other proof attacking the plaintiff's case, to raise a question of fact and thus secure a submission of the case to the jury. If testimony of this character is to be received, then the purpose of this salutary statute will be thwarted. If this rule obtains and the sample shows the milk very badly adulterated, containing water largely above the margin prescribed by the statute, the defendant may always make a question of fact by stating that he or those in charge of the milk had not interfered with it. The offense at which the statute aims is selling or exposing for sale adulterated milk, and the statute has defined what constitutes adulteration. The only requisite to a cause of action is proof of a sale of this kind."

In People v. Bowen, 182 N. Y. 1, 74 N. E. 489, relied upon by the appellant's counsel, the complaint charged that the defendant offered for sale milk which was "adulterated and did contain a foreign substance, to wit, formaldehyde, as a preservative." The plaintiff gave evidence tending to show that formaldehyde was in the milk when

exposed for sale. The defendant then attempted to show that no formaldehyde or foreign substance was added to the milk by him or any one in his employ, which evidence was excluded, and the Court of Appeals reversed a judgment in favor of the plaintiff for this error. The court in its prevailing opinion expressly distinguished the adulteration of milk caused by the addition of a foreign substance to it from the increase of water, which is in all milk. The court say at page 7 of 182 N. Y., at page 491 of 74 N. E.:

"Putting a foreign substance into milk is a physical act and may become an issuable fact under the statute. It is capable of proof by either direct or circumstantial evidence, and this proof may be met by showing that the direct evidence is false, or by breaking the chain of circumstances. Water is a substance not foreign to milk, for it is the chief ingredient of the purest milk, and hence the statute deals with it eo nomine, while all foreign substances are dealt with generally by prohibiting the sale of milk into which they have been introduced. Cows do not give formaldehyde, which, therefore, is a foreign substance, and, if any was found in the defendant's milk, it was either put in by design or got in by accident."

The court in its opinion continued the discussion of this proposition at considerable length, approving the "Cipperly and kindred cases," in each of which the violation of the statute consisted in an excess of water, and held that they were not applicable to a case where such violation consisted of the addition of a substance not one of the natural properties of milk.

The definition of adulterated milk by the Legislature establishes a definite arbitrary standard. A cow or herd of cows giving milk not fulfilling the test of the statute must be in a very bad condition, and such an instance must be rare. Milk not conforming to the standard is not wholesome, and the health of the consumers of this universal product ought not to be jeopardized by drinking it. In this case the milk was badly adulterated. Its analysis showed a marked surplus of water and a noticeable diminution in the required percentage of solids and fats. The analysis of the chemist was not discredited. The defendant was home when Murray returned with the duplicate sample. Apparently he did not cause it to be analyzed. In view of all these undisputed facts, I think the court below did not err in directing a verdict for the plaintiff.

The judgment should be affirmed, with costs.

Judgment affirmed, with costs. All concur, except WILLIAMS, J., who dissents on the ground that the sample taken was not a fair sample; that it should have been taken from a mixture of the four cans instead of two.